**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Maxie Eldon MILTON, Eugene L.
Fowler, and Andrew Areaux,
Defendants-Appellants.**

No. 75–4434.

United States Court of Appeals,
Fifth Circuit.

July 5, 1977.

Eugene L. Fowler, pro se.

Donice Alverson, New Orleans, La., court appointed for Fowler.

Maxie E. Milton, Lee R. Leonard, New Orleans, La., for Milton and Areaux.

Gerald J. Gallinghouse, U. S. Atty., Teresa Marie Black, U. S. Organized Crime Force, New Orleans, La., for plaintiff-appellee.

Before GOLDBERG, SIMPSON and FAY, Circuit Judges.

GOLDBERG, Circuit Judge:

Maxie Milton, Eugene Fowler, and Andrew Areaux were among eleven persons charged in January 1973 with conducting an illegal gambling business in violation of 18 U.S.C. § 1955.[1] Of the ten defendants convicted after a jury trial, Milton, Fowler and Areaux have filed this appeal. Fowler contends chiefly that the government failed to show that the bookmaking operation in which he concededly participated comprised five or more persons as required by § 1955(b)(1)(ii). Milton and Areaux contend

---

1. 18 U.S.C. § 1955 provides in part as follows:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

Louisiana Revised Statutes, § 14:90, provides as follows:

Gambling is the intentional conducting or directly assisting in the conducting, as a business, of any game, contest, lottery, or contri-

solely that expert witnesses for the prosecution "invaded the province of the jury" by testifying with respect to ultimate facts in the case. We find both contentions meritless and accordingly affirm.

## THE BOOKMAKING OPERATION REVISITED

As we explained in *United States v. Box*, 530 F.2d 1258 (5th Cir. 1976), a successful bookmaker is not a gambler but a businessman. He makes his profits not from winning bets, but from collecting a certain percentage of the amount bet that the losing bettors must pay for the privilege of betting. This percentage, usually 10%, is called "juice" or "vigorish."[2] A bookmaker normally has a "line" or "point spread" on each game on which he is taking bets. The calculation is that an equal number of wagered dollars will be attracted to either side of the point spread. Thus, if the line in pro football is Washington by six over Dallas,[3] the bookmaker expects some bettors to wager as much on Dallas to win or to lose by six or fewer points as others will bet on Washington to prevail by more than six points. When this is true, the bookmaker is guaranteed a profit of exactly 10%. When it is not, he may win more than 10% or fail to clear 10%. When the bets placed with a bookmaker are unbalanced, the risk-averse entrepreneur will adopt one of two strategies. The bookmaker may adjust his line up or down until it reaches equilibrium. More likely he will seek to "lay off" a bet to another bookmaker or to a mere bettor. That is, the bookmaker will bet the more popular of the two teams in the amount (ideally) by which bets on that team exceed the sum bet on the disfavored team at a given point spread. If the popular team wins, he will thus pay out to his bettors more than he took in, but will offset this disbursement by his own lay off winnings. By this device the bookmaker seeks to balance his books and assure himself neither more nor less than a 10% profit.

If a bookmaker sets his line badly, he may find it difficult to lay off a sufficient number of bets to offset the risk of loss. Hence accurate "line information" regarding the expectations of his customers proves crucial.[4] Moreover, bookmakers in a relevant market will seek to set a common line. If a particular bookmaker gives the Cowboys 6 points when all others give the Cowboys 3 points, all rational Cowboys fans will bet with the bookie who was out of line, and the rational Redskin fan (possibly an oxymoron) with all others. A rational bettor, as opposed to a rational fan, however, will bet equal amounts on the Cowboys plus six *and* the Redskins minus three. At worst, this cynical but rational bettor will win one bet and lose the other, suffering a net loss of 10% of the losing bet; at best, he will win both wagers.

vance whereby a person risks the loss of anything of value in order to realize a profit.

Whoever commits the crime of gambling shall be fined not more than five hundred dollars, or imprisoned for not more than six months, or both.

**2.** Thus, one must risk $110 to win $100. Authorities for this discussion include not only previous opinions of this and other circuits, which provide excellent primers for the aspiring student of bookmaking, *see, e. g., United States v. McCoy*, 539 F.2d 1050, 1059–60 (5th Cir. 1976); *United States v. Box, supra*, 530 F.2d at 1261–62; *United States v. Joseph*, 519 F.2d 1068, 1070 n.2 (5th Cir. 1975), *cert. denied*, 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 312 (1976); *United States v. Thomas*, 508 F.2d 1200, 1202 n.2 (8th Cir.) *cert. denied*, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975), but also the testimony of experts in the case at bar.

**3.** A faint possibility indeed, the courageous exploits of Billy Kilmer notwithstanding.

**4.** Indeed, sophisticated bookmakers (and we use the word sophisticated in its Runyonesque sense only) will often utilize techniques of market research that in more conventional businesses might be used to peddle a new mouthwash or detergent. Upon settling on a preliminary line, such a sophisticated bookie will call a selected sample of bettors in an attempt to predict the market for particular point spreads. On the basis of test group results, the bookie will adjust the line, then place the modified "product" on the market.

These hazards of the bookmaking business may be minimized, then, by lay off bets and frequent exchanges of line information among bookmakers. The difficult question in cases of this kind is typically whether lay off wagers and exchanges of line information among individuals or bookmaking operations suffices to create an illegal gambling operation comprising five or more persons.

## THE JURISDICTIONAL FIVE

■ For assessing appellant Fowler's claim that the bookmaking organization in which he participated lacked five members, we have our pick of seven conceded bookmaking operations from which potentially to fashion the critical mass of five individuals.

Appellant Fowler concedes that he was a clerk for James Kent's bookmaking operation, that Thais Nix was a runner for that operation, and that Joseph Mills was a commission bookmaker working for James Kent. Fowler denies that more than four people were involved in the enterprise. The jury disagreed.

Evidence at trial, including transcripts of conversations recorded by government wiretaps, indicated that James Kent's bookmaking operation exchanged lay off bets and line information with bookmaking organizations operated by Angelo (Uncle Lon) Nicotri, Victor Candiotto, Tony Martinez, Maxie (Fat Man) Milton, Andrew Areaux, and John (Rose) Kent. The jury's conclusion that the prosecution met its burden of establishing the jurisdictional five need only have rested on the premise that any one of these bookmakers was part of James Kent's operation.

■ Much of the government's evidence is, nevertheless, at best problematic and at worst insufficient to sustain the jury's conclusion, and we take this opportunity to reiterate why this should be so. Simply put, evidence that two bookmakers occasionally exchange line information does not itself warrant the conclusion that one bookmaker is a participant in the other's operation for purposes of § 1955. Rather, it must be shown additionally that the receipt of line information by one bookmaker substantially affects the other's business or that there is a constant exchange of line information between the two. *See United States v. McCoy*, 539 F.2d 1050, 1061–62 (5th Cir. 1976). Similarly, isolated and casual lay off bets between bookmakers may not be sufficient to establish that one bookmaker is conducting or financing the business of a second. *See id.* at 1061; *United States v. Thomas, supra*, 508 F.2d at 1206. Moreover, bets between bookmakers may be personal wagers that are not lay off bets. On the other hand, evidence of a consistent pattern of lay off betting or exchanging line information between two bookmakers may establish the essential link between them for purposes of § 1955.[5]

We need not explore these complexities in the case at bar; even without considering the pattern and frequency of lay off betting and exchanging line information, the evidence showing Fowler's bookmaking organization to comprise the jurisdictional five excluded all reasonable contrary hypotheses. For example, evidence showed that appellant Andrew Areaux collected wagers from customers on behalf of James Kent's bookmaking organization and received commissions from James Kent for his efforts.[6] The evidence that Areaux was a commissioned bookmaker for James Kent may be broken down into four elements. First, the transcripts produced by the government's wiretap surveillance revealed that Areaux frequently called in bets to the Kent office, where Fowler received the calls. In at least some of these it is clear

---

5. *See e. g., United States v. Guzek*, 527 F.2d 552 (8th Cir. 1975) (evidence as to certain appellants sufficient because they were bookmakers who exchanged line information on an almost daily basis); *United States v. Schaefer*, 510 F.2d 1307 (8th Cir.), *cert. denied*, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975) (bookmakers were systematically and continuously involved in single gambling business).

6. *See, e. g.*, Vol. III, Trial Transcript at 91, 129–43, 197, 265–82, 342, 377–84.

that Areaux was calling in bets made by others.[7] Second, the transcripts show that Fowler and Areaux discussed customers of the Kent organization. Fowler admonished Areaux to make sure that the customers continued to bet.[8]

Third, the record discloses that Fowler telephoned Areaux to apprise him of line changes made by the Kent organization. An efficient bookmaking organization must constantly alert its commissioned agents to line updates. The main organization is obligated to honor all bets collected by its agents at the point spread the sub-bookies announce to their customers. The agent is often out of contact with the main organization and the line he peddles may thus lag dangerously behind market fluctuations.

Hence the line updates Fowler offered Areaux are significant. Finally, police seized from Areaux the latter's "catch up" records, revealing the base amounts on which he expected to earn a commission.[9]

In short, the evidence showed that James Kent's organization employed Areaux as a commissioned bookmaker. Areaux consistently passed on his customers' bets to Kent and expected in return a percentage of the profits. His efforts were not sporadic or casual, but rather evince a carefully planned and coordinated effort between Areaux and Kent's agent, Fowler.[10]

■ We conclude that there was ample evidence to support Fowler's conviction for violating 18 U.S.C. § 1955.[11] The juice was

---

7. See Vol. III, Trial Transcript at 342.

8. For example, Areaux (A) and Fowler (G) discussed one customer who, though branded a "born loser," had apparently gotten the better of Kent of late:

> A: OK. Think we can beat him later on?
> G: I hope so.
> A: I know you don't know nothing.
> G: Naw, he's a sucker huh?
> A: Yeah, he's a, he's a, he's a born loser. I been knowing him for a long time.
> \* \* \* \* \* \*
> G: As long as he keeps bettin' now. You know.
> A: Ya got a shot.
> G: Ya got a shot.
> A: Oh, he'll play.
> G: If, if he, you know. Like he's got me beat almost a thousand dollars this week.
> A: Yeah.
> G: If he stops bettin' though it ain't no [expletive deleted] good.
> A. No, he won't stop.
> G. You know. You get that [expletive deleted] make that [expletive deleted] keep bettin you man.

Vol. III, Trial Transcript at 269–70.

9. Bookmakers who hire other bookmakers to accept wagers on a commission basis typically offer 25% of the winnings on sports bets and 50% of the winnings on horseracing action. A "bankroll" is the amount by which a commissioned bookmaker's winnings exceed losses on a particular day, and hence the base amount on which the latter takes commission. "Catch up" is the term used by commissioned bookmakers to describe the situation in which losses exceed winnings, when no commission is due.

10. We thus need not comment on other ways of aggregating the jurisdictional five, including the candidacy for this select group of one Sidney (Lamb Chops) Militaire, whom Kent employed to provide service information at between $100 to $150 per week.

11. Appellant Fowler also objects to an instruction given the jury. Because he failed to object to that instruction at trial, he must, of course, demonstrate that the court's offering it was plain error. The instruction was as follows:

> If you find that five or more persons knowingly associate themselves together to carry out a common plan or arrangement, with the intent either to accomplish some unlawful purpose, or to accomplish some lawful purpose by unlawful means, there arises from the very act of knowingly associating themselves together with such intent, a kind of partnership in which each member becomes the agent of every other member so, where the evidence in the case shows such a common plan or arrangement beyond a reasonable doubt, evidence as to an act knowingly done or a statement knowingly made by one such person while the common plan or arrangement is continuing, and in furtherance of some object or purpose thereof, is admissible against all.

Fowler contends that giving this instruction was plain error because it is a classic conspiracy instruction and the appellants were not on trial for conspiracy.

The instruction did not charge the jury to find a conspiracy violation. Strictly speaking, it deals only with the admissibility of evidence rather than with the basis for conviction. Even considering the instruction as a guide to the admissibility of evidence, however, it is worth noting that the theory underlying it has been applied in § 1955 cases. In *United States v. DiMuro*, 540 F.2d 503 (1st Cir. 1976), for exam-

spread and Fowler and Areaux were spliced into the quintant arc of conduction. The circuits were serpentine and heavily insulated, but the conduction points equalled or exceeded the quintet required by § 1955.

## EXPERT TESTIMONY

■ The sole issue raised by appellants Milton and Areaux is that the government's expert witnesses "invaded the province of the jury" by interpreting transcripts of conversations among the defendants. Specifically, Milton and Areaux object to the witnesses' interpretation of certain bets as lay off bets, to the experts' inferences regarding each defendant's role in Kent's organization, and to expert testimony that a bookmaker who for commission passes wagers on to a central gambling operation becomes part of that operation.

■ We reject appellants' attack. Rule 704 of the Federal Rules of Evidence provides:

> Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

To be sure, Rule 704 does not paint with a broad brush, and expert opinion evidence may still be excluded if its prejudicial impact substantially outweighs its probative value, if it wastes time, see Rule 403, Fed.R. Evid., or if the trial court determines that the expert's specialized knowledge will not assist the trier of fact to understand the evidence. See Rule 702, Fed.R.Evid. Although the qualifying of a witness as an expert does not render his every conclusion immune from challenge, see United States v. Ragano, 476 F.2d 410 (5th Cir. 1973), the mere fact that an expert's conclusion trenches upon a jury issue does not compel its exclusion. Wigmore aptly characterizes the basis usually assigned for the "ultimate issue" rule—that the witness may not usurp the province of the jury—as "a mere bit of empty rhetoric." VII Wigmore § 1920 (3d ed.).

Rule 704 abolishes the per se rule against testimony regarding ultimate issues of fact. By the same token, however, courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law. See Huff v. United States, 273 F.2d 56 (5th Cir. 1959).

The trial court in the case at bar did not err in allowing the government's experts to characterize certain wagers as lay off bets or to interpret the transcripts with respect to appellants' respective roles in James Kent's gambling organization.[12] This court recently observed in a § 1955 case presenting a similar issue:

> Although we have, on occasion, frowned upon the practice of asking an expert to give his conclusions as to the entire case (see United States v. Ragano, 5 Cir. 1973, 476 F.2d 410, 416–17) admissibility of an expert's conclusion depends

---

ple, appellant bookmakers had been connected to a centrally controlled gambling organization. Appellants argued that it was improper to admit against a defendant information from branches of the organization with which that defendant was not directly concerned. The court disagreed, holding that it was proper to admit all such information against all appellants connected with the organization. *Id.* at 508 n. 5.

In any event, the appellants have not demonstrated that this instruction was prejudicial on the facts of this case. Without endorsing the use of this instruction in future § 1955 cases, it is clear to us that, on the facts of this case and taking the court's charge as a whole, its use in the case at bar did not amount to plain error. The charge elsewhere made clear that each defendant had to be connected by virtue of his

or her own acts with a gambling organization meeting the requirements of § 1955.

**12.** Ironically, a survey of the trial transcript reveals at least twelve instances in which defense attorneys clearly sought to elicit on cross-examination precisely the kind of conclusions about which appellants now complain. See Vol. I at 326, 377, 332, 500; Vol. II at 112, 194, 215, 225, 227, 229; Vol. III at 56, 190. This appears to have been ignored by appellants' counsel on appeal, who cites as an example of the abuse of expert testimony a conclusion that defense counsel elicited on cross-examination. See Brief for Appellants Milton and Areaux at 13, quoting Vol. III, Trial Transcript at 108.

on the nature of the issue and the circumstances of the case, and involves a large element of judicial discretion. *Hamilton v. United States*, 5 Cir. 1934, 73 F.2d 357, 358–59.

Here, in characterizing certain transactions as lay-offs, the expert was correctly drawing "inferences from the facts which a jury would not be competent to draw". McCormick, Evidence § 13 (1954). It is questionable that these conclusions concerned an "ultimate issue". Even if they did, that does not require their exclusion. *Hamilton, supra.* The testimony challenged here is not unlike that referred to in upholding § 1955 convictions in *United States v. Bohn*, 8 Cir. 1975, 508 F.2d 1145, 1149–50, *cert. denied,* 421 U.S. 947, 95 S.Ct. 1676, 44 L.Ed.2d 100. *See also* Fed. Rule Evid. 704.

*United States v. McCoy, supra,* 539 F.2d at 1063.

A third aspect of the expert testimony objected to by appellants raises a more colorable claim. The court allowed a government witness who was interpreting the transcripts to enumerate certain activities that ostensibly established the actor as "a part of the gambling business." The witness's statement in context is as follows:

> There's a statement almost halfway through the page where Mr. Rose says: "A friend of mine gave me Florida plus And then further on: "I'll hold a couple of dollars on that myself." An individual who accepts wagers either from a friend, usually a bookmaker's immediate customers, or, of course, his friends, but a person who accepts wagers from other individuals, whether they be friends or associates, he passes them all on to a gambling business; if he does this for profit in the case of an agent or a sub-book or as a commissioned book that makes him part of that business.

Vol. III, Trial Transcript at 372–73. Appellants urge that this statement should have been excluded as a legal conclusion.

The conclusion that one who passes on bets for a percentage of profits is a part of the central gambler's business may, if taken out of context, seem more like a legal than a factual conclusion. In the context in which this statement appears, however, and under the circumstances of this complex case, we cannot say that the district court erred in allowing it. The government's witness was interpreting an otherwise obscure transcript and drawing upon his experience in the field to give some content to the role of the commissioned bookmaker. There is no contention that, insofar as the agent stated the law, he stated it incorrectly.[13] In any event, the statement is more amenable to interpretation as an empirical observation that a commissioned bookmaker is characteristically part of a central bookmaking operation. The statement was not likely taken as promoting a legal doctrine that for purposes of § 1955 one who passes on bets for profit necessarily conducts the central gambling business. Indeed, the witness mentioned neither § 1955 nor any of its operative terms.

Finally, the trial court's admonitions to the jury to accord no unusual deference to expert testimony and to take the court's instructions as the sole source of applicable law, and its careful instructions regarding the necessary factual conditions for finding that a person "conducted" a gambling business for purposes of § 1955 helped protect against the jury's misconstruing this statement.

The provinces of judge, jury and expert witness are not cartographically immutable and precise. Courts must accommodate to the expertise that the jury must receive from those who possess it, lest the jury

---

**13.** The touchstone for determining whether an accused "conducts an illegal gambling business" for purposes of § 1955 is whether that person "performs a necessary function other than as a mere customer or bettor in the operation of illegal gambling." *United States v. Joseph, supra,* 519 F.2d at 1071, *citing United States v. Jones,* 491 F.2d 1382, 1384 (9th Cir. 1974).

flounder in confusion begotten by the arcane. The trial judge must have discretion to discern the needs presented by a particular case and the forms of expert testimony that may best guide the jury over unfamiliar terrain.

In this case the jury's task was to parse the argot of gambling. A predilection for gambling may be a constant in societal arrangements, but its modes have changed and not every person is acquainted with its permutations and variations.

The odds were that both judge and jury needed some expert guidance in penetrating the lines, finding the lay offs and putting all the odds together to decide whether the composite was gambling within the ambit of § 1955. The court was obligated to see the bookmaker's lexicon made intelligible to those unlearned in the argot if not the art. The jurors had to understand the gambler's lyric before they could sing the fateful quintain.

The judgment of the district court is AFFIRMED.