**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Michael Wood JONES, Frank J. DeLuna, Raymond Arnona and Robert Lee Wilson, Defendants-Appellants.**

No. 82–3475.

United States Court of Appeals, Fifth Circuit.

Aug. 1, 1983.

Rehearings Denied Sept. 15, 1983.

---

Frank G. DeSalvo, Bernard E. Fulghum, Jr., New Orleans, La., for DeLuna & Jones.

Thomas R. Dyson, Jr., Washington, D.C., for Arnona.

Anthony L. Glorioso, New Orleans, La., for Wilson.

John Voorhees, Asst. U.S. Atty., New Orleans, La., William C. Bryson, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before CLARK, Chief Judge, GOLDBERG and REAVLEY, Circuit Judges.

CLARK, Chief Judge:

Under 18 U.S.C. § 1955,[1] a person convicted of operating an illegal gambling

1. Section 1955 provides in relevant part:

(a) Whoever conducts, finances, manages, supervises, directs or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

business may be imprisoned for up to five years and fined $20,000. This statute makes a gambling business "illegal" only if it "involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business...." § 1955(b)(1)(ii). This appeal poses a recurring question: How significant must a person's activities be with respect to a gambling business for him to be included in the federal "jurisdictional five"?

A total of eight defendants were tried in the district court for violating section 1955 and related statutes. Six were convicted: Michael Wood Jones, Frank DeLuna, Raymond Arnona, Robert Wilson, Masilea Arnona, and Lester Doming.[2] Jones, DeLuna, and Raymond Arnona candidly admit being partners in a large-scale New Orleans bookmaking operation in violation of Louisiana law. We thus take the liberty of referring to them hereinafter as "the bookies." The bookies' effort below, renewed here, was directed at rebutting the government's position that the other defendants were part of their operation. Of the remaining three who were convicted, only Wilson appeals. He admits some involvement in the bookies' business but denies that this involvement was sufficient to support his conviction.

We have reviewed the record carefully in light of the challenges made by Wilson and the bookies and conclude that the evidence was sufficient to support the jury's finding that all four were part of an illegal gambling business involving five or more persons. We also find the appellants' other contentions without merit. The judgment entered by the district court upon the jury's verdict is accordingly affirmed.

## I. ANATOMY OF A BOOKMAKING OPERATION

For the benefit of the non-gambler, we begin with an outline of the basic principles of bookmaking. *United States v. Milton,* 555 F.2d 1198 (5th Cir.1977), authored by another member of this panel, provides a good explanation. We borrow from it.

[A] successful bookmaker is not a gambler but a businessman. He makes his profits not from winning bets, but from collecting a certain percentage of the amount bet that the losing bettors must pay for the privilege of betting. This percentage, usually 10%, is called "juice" or "vigorish." A bookmaker normally has a "line" or "point spread" on each game on which he is taking bets. The calculation is that an equal number of wagered dollars will be attracted to either side of the point spread. Thus, if the line in pro football is Washington by six over Dallas, the bookmaker expects some bettors to wager as much on Dallas to win or to lose by six or fewer points as others will bet on Washington to prevail by more than six points. When this is true, the bookmaker is guaranteed a profit of exactly 10%. When it is not, he may win more than 10% or fail to clear 10%. When the bets placed with a bookmaker are unbalanced, the risk-averse entrepreneur will adopt one of two strategies. The bookmaker may adjust his line up or down until it reaches equilibrium. More likely he will seek to "lay off" a bet to another bookmaker or to a mere bettor. That is, the bookmaker will bet the more popular of the two teams in the amount (ideally) by which bets on that team exceed the sum bet on the disfavored team at a given point spread. If the popular team wins, he will thus pay out to his bettors more than he took in, but will offset this disbursement by his own lay off winnings. By this device the bookmaker seeks to balance his books and assure himself neither more nor less than a 10% profit.

(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

The appellants have not contested the government's allegations that their gambling business was condemned by state law and met the volume requirement of subsection (iii).

2. Biaggio Alfano and Raymond Joseph Palazzolo, Jr., were acquitted.

If a bookmaker sets his line badly, he may find it difficult to lay off a sufficient number of bets to offset the risk of loss. Hence accurate "line information" regarding the expectations of his customers proves crucial. Moreover, bookmakers in a relevant market will seek to set a common line. If a particular bookmaker gives the Cowboys 6 points when all others give the Cowboys 3 points, all rational Cowboys fans will bet with the bookie who was out of line, and the rational Redskin fan (possibly an oxymoron) with all others. A rational bettor, as opposed to a rational fan, however, will bet equal amounts on the Cowboys plus six and the Redskins minus three. At worst, this cynical but rational bettor will win one bet and lose the other, suffering a net loss of 10% of the losing bet; at best, he will win both wagers.

These hazards of the bookmaking business may be minimized, then, by lay off bets and frequent exchanges of line information among bookmakers. The difficult question in cases of this kind is typically whether lay off wagers and exchanges of line information among individuals or bookmaking operations suffice to create an illegal gambling operation comprising five or more persons.

*Id.* at 1200–01 (footnotes omitted).

## II. SUFFICIENCY OF THE EVIDENCE[3]

As we have noted, the bookies do not deny their involvement in the gambling operation. The sufficiency objections on appeal relate only to the evidence linking Masilea Arnona, Robert Wilson, and Lester Doming to the operation. For purposes of our decision, we need review only the facts relating to Masilea and Wilson. Because we find the evidence sufficient to support inclusion of the two of them along with the

three bookies to make up the requisite jurisdictional five, discussion of the involvement of Lester Doming, who did not appeal, is obviated.

### A. Masilea Arnona

The evidence connecting Masilea to the bookies' operation was primarily the product of surveillance conducted by the FBI. Government agents testified that Michael Jones regularly went to a phone booth in New Orleans at 4:30 p.m. From there he called Masilea at another pay phone located outside a sports betting facility in Las Vegas. On several occasions Masilea was overheard giving line information to Jones. Jones then shared the information with the other bookies. The betting lines the operation used were very similar to those supplied by Masilea.

Conversations among the bookies[4] demonstrated their reliance on the point spreads Masilea provided. On one occasion, Raymond Arnona asked Jones what the appropriate line was for a particular game. Jones replied, "Well, the [expletive deleted]'s jumping all around, man, I wasn't gonna put it up until I make the call." Later Jones called Raymond back. He said, "This is what she gave me," and proceeded to read off a list of point spreads, including one for the game in question. In several other conversations, the bookies referred to "the lady" and the need to call her and not "leave her stranded."

The clear inference from this evidence is that Masilea was a regular supplier of line information to the bookies. This is enough to bring her within the broad scope of section 1955, which excludes only "mere bettors." *Sanabria v. United States,* 437 U.S. 54, 70–71 n. 26 (1978) ("Numerous cases have recognized that 18 U.S.C. § 1955 (1976 ed.) proscribes any degree of participation

---

**3.** In reviewing a sufficiency challenge, we view the evidence in the light most favorable to the jury verdict. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

**4.** The conversations were intercepted pursuant to a court-ordered wiretap, the legality of which the appellants do not challenge. Inter-

cepted conversations provided the bulk of the government's case below. The wiretap lasted for nineteen days, from December 14, 1980, to January 1, 1981. In all, more than 2,800 calls were intercepted. The bookies were overheard accepting at least $736,000 in wagers.

in an illegal gambling business, except participation as a mere bettor.")

### B. Robert Wilson

Robert Wilson conducted a separate New Orleans bookmaking operation that had some dealings with the bookies' business. He and the bookies argue that the dealings between the two are insufficient to support his inclusion in the jurisdictional five.

■ Two ostensibly separate bookmakers may be linked for purposes of section 1955. Casual conversation between the two is not enough. There must be some showing of interdependence. A frequent exchange of line information or a consistent pattern of layoff betting will suffice. *United States v. Avarello*, 592 F.2d 1339, 1349 (5th Cir.1979), *cert. denied*, 444 U.S. 844, 100 S.Ct. 87, 62 L.Ed.2d 57 (1979); *United States v. Boyd*, 566 F.2d 929, 935 (5th Cir.1978); *United States v. Milton*, 555 F.2d at 1201.

■ Here the government attempted to show both. During a nineteen-day wiretap of the bookies' phones,[5] eighteen calls were placed to Wilson. A total of eight wagers were made during these calls. Raymond Arnona placed seven wagers with Wilson, usually for $2,000 apiece. Wilson placed a single wager of $1,000 with Raymond. Of these, only the single bet made by Wilson may fairly be characterized as a layoff bet. In this Circuit a wager is not a layoff wager unless it is placed by a bookmaker for the purpose of ridding himself of excess wagering to achieve a balanced book. *Avarello*, 592 F.2d at 1351–52 n. 21 (citing *United States v. Box*, 530 F.2d 1258, 1261–62 (5th Cir.1976)). The bets placed by Raymond uniformly were on the wrong team to achieve this purpose.[6] His bets increased the risk by making the book more unbalanced than it was previously. Under our law the wagers placed by Raymond were not layoff bets. Whether Raymond was

betting for himself or on behalf of the operation, the evidence shows that he was in fact betting. He was not laying off.

This leaves the single $1,000 wager placed by Wilson. We cannot infer, or allow the jury to infer, a consistent pattern of layoff betting from this single piece of evidence.

■ Despite this, we find the exchange of line information between the two operations sufficient to support Wilson's inclusion in the jurisdictional five. During the eighteen conversations point spreads were frequently discussed. The shorthand method of comparing lines indicates the exchanges were routine.[7] *See Avarello*, 592 F.2d at 1352 ("the tenor of the conversations themselves suggests that the two men dealt with each other with regularity").

The evidence also shows that the bookies used the line information received from Wilson in establishing their own lines. On at least five occasions during the nineteen-day period, the bookies adjusted point spreads in reliance on advice from Wilson. After a December 14 conversation in which Wilson criticized the bookies' lines on two games, the lines were changed to conform to those Wilson was using. This scenario was repeated on several occasions. We agree with the government that this pattern of behavior supports the inference that Wilson's supply of line information substantially affected the bookies' business. *Avarello*, 592 F.2d at 1349. It also rebuts the appellants' contention that Wilson provided line information solely for Raymond Arnona's use in making wagers.

### C. Conclusion

■ Section 1955's coverage is broad. All persons providing services that are necessary or helpful to the gambling operation come within its scope. *United States v. Colacurcio*, 659 F.2d 684, 688 (5th Cir.1981),

---

**5.** See note 4 *supra*.

**6.** In other words, Raymond always bet on the team that the majority of the bookies' customers disfavored. Raymond apparently had little faith in the betting abilities of their "mere bettors."

**7.** Raymond and Wilson simply read off a list of numbers to one another with no reference to the games involved.

cert. denied, 455 U.S. 1002, 102 S.Ct. 1635, 71 L.Ed.2d 869 (1982); *United States v. Tucker,* 638 F.2d 1292, 1295 (5th Cir.1981), cert. denied, 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981). The evidence presented against Masilea Arnona and Robert Wilson was sufficient to support the jury's conclusion that they were part of the bookies' operation. Their activities exceed those of "mere bettors" and thus fall outside section 1955's "sanctuary of bettordom." *United States v. Box,* 530 F.2d at 1267. We reject the argument that the evidence was insufficient to support the appellants' convictions.

## III. OTHER CONTENTIONS

### A. The Expert's Testimony

■ The government's expert witness, FBI Agent Eberhart, testified at length about bookmaking in general and the bookies' operation in particular. He expressed the opinion that all wagers placed by one bookmaker with another are layoff wagers. As we have explained, this is not the law.

The appellants argue that Eberhart's misstatement amounts to a denial of due process. We disagree. The jury was given an instruction accurately reflecting Fifth Circuit law on the definition of layoff bets. The court also charged the jury concerning the weight to be given the testimony of expert witnesses. "Adequate protection was given against the danger that the expert's opinion would be accepted as a legal conclusion." *Avarello,* 592 F.2d at 1392 (rejecting an identical argument).

■ In cross-examining Eberhart, appellants' counsel sought to introduce the prior testimony, from another trial, of a different FBI gambling expert. The evidence was excluded. The appellants now assert that the prior testimony should have been admitted under the learned treatise exception to the hearsay rule, Fed.R.Evid. 803(18). This novel argument is unpersuasive. The learned treatise doctrine is confined to published works that have been subjected to widespread collegial scrutiny. It has never been extended to allow admission of the prior inconsistent testimony of another expert. The construction urged by the appellants is missing the element of trustworthiness that is inherent in the learned treatise exception. We decline to adopt it.

### B. Excusing Jurors for Cause

During voir dire, the trial judge asked the members of the jury panel whether they had ever gambled on sporting events with bookmakers. Five of them responded affirmatively. The judge then questioned these jurors individually. One of them stated that he would be influenced if his bookmaker were mentioned during the trial. The other stated that he would be influenced if his bookmaker were called as a witness. The government moved to strike for cause all five prospective jurors who had wagered in the past. The court granted the motion only as to the two who admitted they might be influenced. The appellants claim this was error.

■ The decision whether to excuse jurors for cause is committed to the discretion of the trial court. We will not interfere with such decisions absent a clear abuse of discretion. *E.g., United States v. McCord,* 695 F.2d 823, 828 (5th Cir.1983); *United States v. Jimenez-Diaz,* 659 F.2d 562, 568 (5th Cir.1981), cert. denied, 456 U.S. 907, 102 S.Ct. 1754, 72 L.Ed.2d 164 (1982). There was no abuse here. In light of the large number of intercepted calls that were played during the trial, it was entirely possible that the bookmakers utilized by the two prospective jurors could have been mentioned. Moreover, as the government points out, a defendant charged with a particular crime has no right to have on his jury persons who admit activities similar to those charged in the indictment. The potential for bias in such persons is inherently great. Clearly, the court was justified in excluding the two who conceded their participation in gaming could have affected their impartiality even if their individual bookies were not likely to be named.

### C. *Brady* Material

Three persons characterized by the government as unindicted co-conspirators

gave testimony before the grand jury that indicted the defendants. At trial the defendants filed a motion seeking discovery of the testimony under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The motion was denied.

We detect no error in this ruling. The defendants were given the names of the unindicted co-conspirators as well as the substance of their grand jury testimony. *See Hughes v. Hopper,* 629 F.2d 1036, 1039 (5th Cir.1980), *cert. denied,* 450 U.S. 933, 101 S.Ct. 1396, 67 L.Ed.2d 367 (1981) (*Brady* is not violated where the defendant is given the substance of the exculpatory material). Moreover, the defendants knew the unindicted co-conspirators and dealt with them regularly. Defense counsel could have interviewed them and called them as witnesses. Where defendants have ready access to evidence that may be exculpatory, they cannot complain that it was withheld in violation of *Brady. See United States v. Milstead,* 671 F.2d 950, 953 (5th Cir.1982) (the defendant must bear the consequences of his lack of diligence).

D. Prosecutorial Misconduct

The appellants charge that various instances of prosecutorial misconduct deprived them of a fair trial. They complain particularly of government counsel's numerous allegations that defense counsel were guilty of "misdirection" and injecting "false issues" into the trial. Our review of the record reveals that the prosecutor's statements were no more than fair comment.[8]

## IV. CONCLUSION

Our review of the record reveals that the evidence adduced by the government was sufficient to support the appellants' convic-

---

**8.** The transcript of the closing argument shows several references to irrelevant issues by defense counsel. For example, defense counsel asserted (1) that the use of wiretaps is improper; (2) that point spreads were published in the local newspaper; (3) that there was no proof of

tions and that the allegations of trial error are without merit.

AFFIRMED.

violence in the case; and (4) that the government's tape-recording equipment was made in Germany rather than the United States. These contentions might be relevant in some trials, but they were not relevant in this one.