838 F.2d 472
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Donald Henry HAUETER, Defendant-Appellant.
 No. 86-3217.
 United States Court of Appeals, Sixth Circuit.
 Feb. 3, 1988.
 
 Before BOYCE F. MARTIN, Jr., DAVID NELSON, and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Donald Henry Haueter was indicted by a federal grand jury for three violations of the criminal laws: conspiracy to bribe the trustees of a union's welfare and pension plans in violation of 18 U.S.C. Sec. 371, a completed act of bribery in violation of 18 U.S.C. Sec. 1954, and the making of false statements in documents submitted to the trustees in violation of 18 U.S.C. Sec. 1027. A jury found Mr. Haueter guilty of the third charge, but was unable to reach a verdict on the first two charges. Mr. Haueter was sentenced to probation for three years and was fined $10,000 for making false statements; the other charges were dismissed on motion of the government.
 
 
 2
 On appeal, Mr. Haueter contends that his conviction ought to be reversed because of: 1) the admission of irrelevant evidence; 2) the cross-examination of witnesses on inflammatory matters not related to direct examination or to the credibility of the witness; 3) the testimony of three non-lawyers as to the legal effect of a collective bargaining agreement; and 4) improper jury instructions. Finding none of Mr. Haueter's contentions meritorious, we shall affirm his conviction.
 
 
 3
 * Mr. Haueter and his family own Russell Haueter Excavating, Inc., of which Mr. Haueter is president. Haueter Excavating installs utility lines, does major site cleaning, and builds golf courses. Mr. Haueter also manages Haueter Sand & Gravel, a Haueter Excavating subsidiary that extracts, washes, sells, and gravel.
 
 
 4
 From at least 1972 until 1982, Haueter Excavating was a member of the Northern Ohio Contractor's Association ("NOCA"), an association that represents employers in labor negotiations. One of the labor unions with which NOCA dealt was Teamsters Local 436, a bargaining agent for construction truck drivers, among others.
 
 
 5
 The President of NOCA testified that as a member of the association, Haueter Excavating was bound by collective bargaining agreements entered into between NOCA and Local 436 even though the company (like other member companies) had not formally authorized NOCA to serve as its representative. For each employee who was a member of Local 436, employers were responsible for making contributions to employee benefit plans established pursuant to labor contracts NOCA had negotiated with the union. Employers were also required to furnish monthly documents listing covered employees and the amount of the employer contribution.
 
 
 6
 Defendant Haueter testified that he did not believe that his company was bound by the contract between NOCA and Local 436, and thus did not believe that the company had any such obligations with respect to the benefit plans.
 
 
 7
 In early 1981 Haueter Excavating was in arrears on its contributions to the Local 436 welfare and pension plans. The delinquency was brought to the attention of Sam Busacca, president of Local 436 and chairman of the board of trustees of the plans. He sent a letter notifying the company of its delinquency. Mr. Haueter was told of its contents, and he authorized his office manager, Anthony Bartholomew, to send a reply denying any contractual obligation to contribute to the benefit plans.
 
 
 8
 In March of 1981 Angelo Regalo, the business agent of Local 436, telephoned Mr. Haueter and told him that Haueter Excavating owed $7,000 to the welfare fund and $7,000 to the pension fund. Mr. Haueter replied that he could not afford to pay the entire amount at once. Upon learning of this, Mr. Busacca was said to have directed Mr. Regalo to tell Mr. Haueter to pay half of the amount "in cash for us" and to resume payments to the benefit plans on May 1. Mr. Regalo testified that he conveyed that message to Mr. Haueter; Mr. Haueter denied it.
 
 
 9
 In April of 1981 a $3,000 check was issued in the company's name to the Local 436 welfare fund. The check was sent to the union without an accompanying contribution report form. Efforts to determine the identities of the individuals covered by the contribution were unsuccessful; eventually the administrator of the fund somewhat arbitrarily decided which employees were to be covered. Mr. Haueter testified that he was unaware that the check had been sent by his company.
 
 
 10
 In May of 1981 Haueter Excavating began making monthly welfare and pension fund payments for the employees who were members of Local 436. In addition, monthly contribution report forms were filed. The company nonetheless remained on the delinquent list prepared for the plans' board of trustees. In May or early June, Mr. Regalo allegedly spoke to Mr. Haueter about the cash Mr. Busacca had requested. Mr. Regalo was told to contact Office Manager Bartholomew, and Mr. Haueter told Bartholomew to prepare a check for $3,500 payable in the manner requested by Mr. Regalo.
 
 
 11
 Citing a cash shortage, Mr. Bartholomew demurred. Mr. Haueter was said to have insisted that the check be drawn. Mr. Bartholomew then issued a $3500 check made payable to Mr. Regalo's father, Joseph Regalo. The check was cashed, and a substantial portion of the proceeds went to Mr. Busacca. None went to Regalo Senior. The name of Haueter Excavating was later striken from the July delinquency list.
 
 
 12
 Mr. Haueter denied having had any discussions along these lines with Messrs. Regalo and Bartholomew, and he testified that he was unaware of the $3500 check until his records were subpoenaed by the government.
 
 
 13
 The monthly report forms for Haueter Excavating were prepared by Mr. Haueter's sister, Penelope Rosch, who maintained the company's payroll records. She obtained the necessary information from individual earnings records kept for each covered employee. Under the terms of the labor agreement, contributions were required to be made for an employee in any week in which he worked at least one hour.
 
 
 14
 From May of 1981 until the end of that year, the monthly reports were prepared and filed on a regular basis and the required contributions were made regularly. In January of 1982, however, as Ms. Rosch testified, Mr. Haueter directed her to prepare and file contribution reports that failed to reflect the work activity of two employees. The report forms covering January and February 1982 said that two truck drivers ostensibly employed by Haueter Sand & Gravel did not work at all during that period. Haueter Excavating's payroll records, however, indicate that one of the men worked every week during that two-month period, while the other was employed by the company continuously except for the week ending February 20.
 
 
 15
 Mr. Haueter contends that the two truck drivers were engaged in non-construction work such as snow plowing or salt hauling, and that his attorney, Joseph Znidarsic, had advised him that such work was not covered by the collective bargaining agreement and that fund contributions therefore were not required. Mr. Znidarsic's testimony confirmed this, and he noted that he had favorably settled a similar claim made by another union. Mr. Regalo and another union official testified that the fact that drivers were temporarily assigned to other duties did not excuse the employer from making welfare and pension fund contributions on their behalf. The truck drivers themselves testified that during January and February they were engaged in other activities in addition to snow plowing and salt hauling.
 
 
 16
 The pattern of undercontributing continued randomly for several months. Between January and August of 1982 Haueter Excavating failed to report nineteen weeks of covered employment, and made no contributions with respect to the omitted periods. Ms. Rosch testified that for some of the periods in question she had personal problems that might have caused her to make errors in keeping the books, and Mr. Haueter said that he was generally unfamiliar with the company's filings.
 
 II
 
 17
 Appellant Haueter's first assignment of error is that the district court violated Rules 403 and 404(b) of the Federal Rules of Evidence in admitting testimony of other unlawful or bad acts for the purpose of showing appellant's character or propensity to commit the charged acts. Specifically, appellant objects to testimony: 1) that Haueter violated the Davis-Bacon Act, 40 U.S.C. Sec. 276(a), and the NOCA-Local 436 contract by failing to pay prevailing wages; 2) that Haueter paid his employees' initiation fees and union dues in violation of the NOCA-Local 436 contract and in violation of 29 U.S.C. Sec. 186(c)(4); 3) that Haueter did not pay the holiday pay called for by the contract; 4) that Haueter did not pay welfare and pension benefits; and 5) that two payments (characterized as loans), one for $200 and the other for $1,000, were made to Angelo Regalo some years before the offenses charged in the indictment.
 
 
 18
 Appellant argues that admission of such testimony
 
 
 19
 "diverted attention from the real issues before the jury--whether Haueter had bribed a union official, and whether he was responsible for the filing of false monthly contribution reports. Instead the issue became whether Haueter's employees were treated fairly or whether he had secured an unfair advantage over competitors."
 
 
 20
 Appellant further argues that "the confusion generated by the admitted testimony in hundreds of pages of documents containing thousands of entries was intentionally exploited by the prosecutors for the purpose of obtaining a conviction," even though the government had never proved that false reports were filed.
 
 Rule 404(b) states:
 
 21
 "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 
 
 22
 The government has persuasively argued that the testimony in question constituted proof of motive, intent, knowledge, and absence of mistake or accident, while the evidence of the two payments of $200 and $1000 made to Angelo Regalo related to the bribery counts (of which appellant was not convicted), not the false report count.
 
 
 23
 Appellant contends that even if the testimony was admissible under Rule 404(b), it should have been excluded pursuant to Rule 403. The latter rule provides:
 
 
 24
 "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
 
 
 25
 The trial judge is accorded very broad discretion in making such determinations. United States v. Townsend, 796 F.2d 158, 161-62 (6th Cir.1986); United States v. Passarella, 788 F.2d 377, 383 (6th Cir.1986); United States v. Ismail, 756 F.2d 1253, 1259 (6th Cir.1985); United States v. Dabish, 708 F.2d 240, 243 (6th Cir.1983). In reviewing the trial court's exercise of its discretion, we examine the evidence in the light most favorable to the proponent, maximizing its probative value and minimizing its prejudicial effect. United States v. Pollard, 778 F.2d 1177, 1179 (6th Cir.1984); United States v. Holloway, 740 F.2d 1373, 1378 (6th Cir.), cert. denied 469 U.S. 1021 (1984). Having done so in this case, we cannot say that the district court abused its discretion.
 
 III
 
 26
 Appellant takes issue with the manner in which the district court allowed the government to challenge the testimony of certain witnesses. The first alleged error in this respect concerned the testimony of a government witness who was a Haueter truck driver. The truck driver was asked whether he had ever complained to a Teamsters business agent about the amount he was being paid. he responded, "Not really." Over appellant's objection, the prosecutor then tried to impeach its own witness by asking, "Sir, do you recall telling an agent of the Department of Labor that you complained in 1969 to a 436 business agent Angelo Regalo about receiving non-scale pay?"
 
 
 27
 Rule 607 explicitly allows a party to impeach its own witness. The government notes that the truck driver, by virtue of being a long-time employee, had a motive to slant his testimony in favor of the appellant, and we see no error in letting the government try to impeach the credibility of the witness. The fact that the incident had allegedly occurred seventeen years earlier does not make the question improper, the witness having made a statement about the 1969 act in 1982. Furthermore, the proof of the lodging of a complaint with Local 436 was relevant to the appellant's claim that no contractual relationship existed between Haueter Excavating and its drivers.
 
 
 28
 The second alleged instance of prosecutorial misconduct concerned the cross-examination of a clerical employee of Teamsters Local 436. On cross-examination the prosecutor questioned her about her allegedly improper processing of welfare fund checks and claims. Appellant objects that these matters were not in any way related to his company. Furthermore, appellant suggests that questioning about checks made out to one James J. McGettrick was so explosive that the mere mention of the name amounted to prosecutorial misconduct. (McGettrick, a former Cuyahoga County sheriff, was a Common Pleas Court Judge who was the subject of much publicity about possible ethical lapses.) Appellant moved for a mistrial when the witness was questioned about Judge McGettrick, but the court denied the motion.
 
 
 29
 The cross-examination of the clerical employee on the improper processing of checks and claims was permissible under Rule 611(b) of the Federal Rules of Evidence because the questioning had a legitimate bearing on her credibility. Appellant complains that "the fact implied in the questions were never established in evidence," but Rule 608(b) states:
 
 
 30
 "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified."
 
 
 31
 Under this rule, the prosecution could not introduce extrinsic evidence to prove the matters referred to. Finally, the appellant could have asked for limiting jury instructions, but failed to do so.
 
 
 32
 As to the questioning about Judge McGettrick, there has been no showing here that the trial court abused the broad discretion it had under Rule 403. We note also that the jury did not return guilty verdicts on the counts of the indictment most redolent of corruption, which suggests that the jury was not "inflamed" by the questioning about Judge McGettrick.
 
 
 33
 The third instance in which the prosecutor is alleged to have gone beyond the bounds of propriety concerns the questioning of Mr. Znidarsic, the attorney who had advised Mr. Haueter that he need not make contributions for the employees who were plowing snow and hauling salt. During cross-examination, the government asked Mr. Znidarsic about statements he had made to a government agent named Patete. As the defendant notes in his brief, "Throughout cross-examination, the prosecutor strongly suggested, by innuendo and otherwise, that Znidarsic's testimony was inconsistent with what he had told Special Agent Patete." As suggested by our earlier discussion of Rules 611 and 608, however, the cross-examination was proper for impeachment purposes. Appellant's argument that the government was employing "triple hearsay" in the form of questions is without merit. The government was not attempting to establish the truth of the matter asserted in the questions, and the hearsay rules thus had no application here. See Rule 801(c).
 
 
 34
 Appellant also contends that the prosecution ought to have called Special Agent Patete to testify as to what Mr. Znidarsic told him. The government had no such burden. Appellant was free to call Mr. Patete himself, and was free to (and did) have Mr. Znidarsic clarify his testimony on redirect.
 
 
 35
 "In any of those meetings [between Attorney Znidarsic and Labor Department officials] did the investigators indicate their desire to talk to Mr. Haueter?"
 
 
 36
 Appellant contends that merely sustaining the objection was not sufficient to cure the prejudice that may have resulted from the asking of the question. Again, however, appellant failed to request a curative jury instruction.
 
 
 37
 Finally, appellant complains of the way in which he himself was cross-examined. He objects to questions regarding: 1) his having required employees to contribute to the cost of their health insurance; 2) his payment of drivers' union initiation fees; 3) his failure to pay the prevailing wage; 4) the $200 check he paid to Anthony Regalo in 1977; and 5) his failure to pay union scale wages. These questions were all within the scope of the direct examination, and as suggested by our previous discussion of Rule 608, the district court acted within its discretion in allowing such inquiry.
 
 IV
 
 38
 In his next assignment of error, appellant argues that the trial court violated Rules 602, 701 and 702 of the Federal Rules of Evidence by allowing three lay witnesses to offer opinion testimony on legal issues. Frank Caspio, a member of Local 436 for forty-eight years and a union executive and benefit plan trustee for twelve years, testified that he had signed a labor contract with NOCA, was familiar with its terms, and had been involved with the interpretation of the agreement. Mr. Caspio testified that under the terms of the contract it was permissible for truck drivers to be temporarily assigned to other duties and that the reassignment had no effect upon the obligation of the employer to continue to contribute to the union's welfare and pension funds. Mr. Caspio also stated that the hourly wage scale was binding upon employers temporarily reassigned as drivers because the contract so stipulated.
 
 
 39
 Raymond Schloss, the President of NOCA since its creation, also discussed some of the terms of the union contract, indicating that there were provisions for paying fringe benefits that included contributions by employers to union welfare and pension plans. Mr. Schloss stated that he had negotiated the labor contract on behalf of all the members of NOCA and that Haueter Excavating was a member of NOCA and was bound by the contract.
 
 
 40
 Paul Bauman, a Department of Labor investigator, testified that through training and experience he had become familiar with the responsibilities of employee benefit plan trustees. Mr. Bauman stated that such trustees normally have the responsibility to audit a company making contributions to employee benefit plans.
 
 
 41
 The district court's decision to allow the testimony of the three witnesses is consistent with Rules 602, 701 and 702, in our opinion. All of these witnesses were shown to have had personal knowledge of the matters upon which they testified, and the Rules of Evidence impose no blanket prohibition against non-lawyers giving testimony of the sort complained of here. In construing a contract, a court will often look to the practical construction placed on the contract by the parties themselves. Both Mr. Caspio and Mr. Schloss were involved in interpreting and implementing the collective bargaining agreement, and their "opinions or inferences" were limited to those "rationally based on [their] perception." Rule 701. The fact that Mr. Caspio had no understanding as to the classification of someone not engaged in construction work does not mean that he was unqualified to testify about the obligations imposed by the Local 436 contract.
 
 
 42
 Similarly, we are not persuaded by appellant's contention that the trial court erred in allowing Mr. Schloss to "testify that the contract which he negotiated was binding on Haueter Excavating, despite the fact that his association had no written authorization to bind Haueter, that Haueter never approved the contract, that the association had no articles or bylaws which spelled out the rights of its officers or the obligations of its members, and that Haueter had expressly authorized or approved agreements with the only two other unions which whom NOCA negotiated." These are not matters that affected the qualifications of Mr. Schloss as a witness.
 
 
 43
 Appellant contends that the court erred when it allowed Mr. Schloss to testify that "he recognized that the word 'work' was defined by the contract to mean 'construction site work' and that 'construction site work' was defined as the hauling of material from one project to another, or off of a project, but he had no training or experience in applying that definition to the question of whether snow plowing or salt hauling would constitute 'work.' " We do not see how a lawyer could be expected to have any better training or experience in this regard; a lawyer would have to look at industry practices and customs, and might well inform himself on these matters by talking to someone like Mr. Schloss.
 
 
 44
 The testimony of Mr. Bauman was properly admitted as that of an expert, because it was shown that he had had specialized training on the federal statutory law governing employee benefit plan matters. As an investigator for the Department of Labor he was qualified to testify as to what he knew about whether audit responsibility lies with plan trustees or with the government. Appellant does not object to the testimony on relevancy grounds, for he himself opened the door by claiming that audit responsibility lay with the government.
 
 
 45
 The cases on which appellant relies do not help him much. In United States v. Zipkin, 729 F.2d 384 (6th Cir.1984), where this court reversed the conviction of a lawyer charged with misappropriating the funds of a bankrupt estate, the trial court had allowed a bankruptcy judge, testifying as a government witness, to interpret a legal order that he himself had issued. The explanation seemed far broader than the language of the order. We held that it was improper to allow the witness to instruct the jury on applicable principles of law, and we determined that the defendant had been prejudiced because of the special credence a jury could be expected to give the bankruptcy judge's testimony. In the instant case, however, none of the witnesses usurped the function of the trial court as a source of legal principles. Each witness testified to matters on which he had personal knowledge, and none had a status likely to cause the jury to give undue weight to his testimony. The other cases cited by appellant, Marx & Co., Inc. v. Diners' CLub, Inc., 550 F.2d 505 (2d Cir.), cert. denied, 434 U.S. 861 (1977), United States v. Milton, 555 F.2d 1198 (5th Cir.1977), and Huff v. United States, 273 F.2d 58, 61 (5th Cir.1959), support the trial court's ruling, to the extent that they have any relevance at all.
 
 V
 
 46
 Appellant's final assignment of error relates to the jury charge. The judge charged that the Employee Retirement income Security Act (ERISA) prohibits the making of a false statement or the intentional concealment of information that must be disclosed. 18 U.S.C. Sec. 1027. Appellant contends that the prosecution failed to present evidence that appellant intentionally concealed information that had to be disclosed, and the judge therefore ought not to have charged the jury on that part of the statute. In fact, however, the prosecution did present evidence of concealment. There was testimony, for example, that appellant had instructed his sister to make out false reports not disclosing the hours the truck drivers had work in snow plowing or salt hauling.
 
 
 47
 The trial court's instructions on the meaning of "reasonable doubt" and "proof beyond a reasonable doubt" included this language:
 
 
 48
 "The Government has the burden of proving him guilty beyond a reasonable doubt, and if it fails to do so you must acquit him.
 
 
 49
 Thus, while the Government's burden of proof is a strict or heavy burden, it is not necessary that the Defendant's guilt be proved beyond all possible doubt. It is only required that the Government's proof exclude any reasonable doubt concerning the Defendant's guilt. A reasonable doubt is a real doubt, based upon reason and common sense after careful and impartial consideration of all the evidence in the case.
 
 
 50
 Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs. If you are convinced that the accused has been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so."
 
 
 51
 Appellant contends that this definition "unconstitutionally diluted the burden of proof imposed on the government." In Holland v. United States, 348 U.S. 121 (1954), the Supreme Court said that "reasonable doubt" could be defined "in terms of the kind of doubt that would make a person hesitate to act." 348 U.S. at 140. Appellant contends that the trial court erroneously transformed this definition of "reasonable doubt" into one of "proof beyond a reasonable doubt." Appellant argues that "[i]t is inconceivable that the same language can be used to accurately convey that notion of the high degree of certainty which permits conviction, proof beyond a reasonable doubt, as is used to describe the possibility of innocence which justifies acquittal, reasonable doubt." Appellant's argument strikes us as nothing more than a semantic quibble.
 
 
 52
 The judgment of conviction is AFFIRMED.