Rickey E. HANEY, Plaintiff-Appellant,

v.

MIZELL MEMORIAL HOSPITAL, a corporation; Dr. John Meigs, Defendants-Appellees.

No. 83–7315.

United States Court of Appeals, Eleventh Circuit.

Oct. 26, 1984.

**1470**

George E. Day, Donald R. Colpitts, Fort Walton Beach, Fla., for plaintiff-appellant.

Robert E. Parsons, Birmingham, Ala., for Mizell Memorial Hosp.

Robert D. Norman, Robert L. Williams, Marcus W. Lee, Birmingham, Ala., for Dr. John Meigs.

Before FAY and JOHNSON, Circuit Judges, and YOUNG *, District Judge.

---

* Honorable George C. Young, U.S. District Judge for the Middle District of Florida, sitting by

FAY, Circuit Judge:

This diversity medical malpractice action was brought against Dr. John Meigs and Mizell Memorial Hospital asserting negligence in the diagnosis and treatment of plaintiff Rickey E. Haney, who now is a quadriplegic. The jury which heard this case returned a verdict in favor of the defendants, and the district court entered judgment on April 22, 1983. Haney assigns as reversible error several evidentiary rulings by the district court, allegedly inflammatory and prejudicial remarks made by counsel for the defendants during opening statements to the jury, and he additionally contends that the jury's verdict is not supported by the evidence adduced at trial. Dr. Meigs questions this court's appellate jurisdiction. For the reasons set forth below, we conclude that this court does have jurisdiction to hear this appeal and we affirm.

FACTS

Haney and a friend began drinking beer and whiskey shortly after noon on December 4, 1981, and continued doing so until early the next morning, when they retired for the day. They greeted the following morning with more beer and whiskey in Haney's home, and then visited a few local taverns. The merriment of that Saturday afternoon, however, came to an abrupt halt when the car Haney and two of his companions were occupying ran off a country road and overturned several times.

Haney's friends managed to crawl out of the car, which had come to rest on its right side. Haney, who was hanging out of the driver's door, was lowered by them to the ground. At this time, Haney complained of back pain. His friends rolled him over on the ground to discover the source of the blood they noticed on him.

The emergency medical technician who arrived with the rescue squad strapped Haney to a hard backboard and attempted to immobilize his neck with a technique called "sandbagging." During transport to Mi-

designation.

zell Memorial Hospital, Haney cursed, struggled to free himself of the straps to the backboard, and tried to sit up, despite warnings that any movement could be dangerous. The technician described Haney as uncooperative and noticed that he smelled of alcohol.

In the emergency room, Haney showered profanities on the medical personnel. He also lifted himself off the backboard and looked around, in defiance of orders to the contrary. The nurses who initially examined him believed he was extremely drunk. Their examination of him revealed no neurological problems. In fact, Haney exhibited full range of motion with his arms and legs. Because of his unruliness and apparent inability or unwillingness to communicate to them exactly where he was in pain, the nurses were unable to localize the source of Haney's discomfort.

Dr. Meigs, the emergency room physician on duty, next examined Haney. Haney's obstreperousness impeded the doctor's efforts to give him a thorough neurological examination. When asked where he hurt, Haney complained of pain in the neck, then upon further questioning would deny pain there and identify another part of his body, and so on. After extensive interrogation, Dr. Meigs concluded that the source of Haney's pain was an abrasion on the shoulder blade, which was promptly treated. Dr. Meigs also sutured the laceration to Haney's head. Since the doctor was concerned about Haney's level of intoxication and the possibility of a head injury, he admitted Haney for overnight observation. No x-rays were ordered.

Haney was then taken to a ward, and transferred from the emergency room stretcher to a bed. A standard hospital pillow was placed under his head. Shortly thereafter, Dr. Meigs was contacted by a nurse who informed him that Haney was having problems with congestion. The doctor examined Haney, and ordered that he not be given food or fluids to diminish the likelihood of vomiting.

At approximately 10:00 p.m. that evening a nurse noticed that Haney was exhibiting signs of paralysis. The on-call doctor was promptly summoned. He immobilized Haney's neck and ordered that x-rays be taken. Although the x-rays of the cervical spine and thorasic area did not clearly show a fracture, the on-call doctor was concerned about possible spine or spinal cord injury. As a result, Haney was transported to a medical facility in Pensacola, Florida, which was better equipped to handle a neurological patient.

It ultimately was determined that Haney had fractured two cervical vertebrae. Resultant damage to the spinal cord has left Haney a permanent quadriplegic.

Haney brought suit against Dr. Meigs and Mizell Memorial Hospital essentially alleging negligent diagnosis and treatment of him. A jury trial lasted nearly three weeks.

At trial, Haney contended that while the fracture probably occurred during the car accident, the actions of the defendants caused a subluxation of the damaged vertebrae resulting in permanent paralysis. Haney introduced evidence that proper medical procedure would have included prompt x-rays of his neck. Expert witnesses called on his behalf testified that x-rays would have prompted concern over a possible fracture thereby resulting in immobilization of the neck. His experts further testified that immobilization would have diminished the likelihood of permanent paralysis.

The defendants, on the other hand, presented evidence that because of Haney's intoxication, combativeness, and unwillingness to cooperate with medical personnel, it was nearly impossible to properly diagnose him. The defendants' experts also opined that Haney's own movements could have caused the ultimate injury. These witnesses further testified that irrespective of defendants' conduct, the spinal cord damage more likely than not occurred during the car accident, and it was only a question of time before this damage manifested itself in permanent paralysis. The jury returned a verdict for the defendants, and judgment was entered by the district court on April

22, 1983. Haney's notice of appeal was docketed on May 24, 1983.

JURISDICTION

Before we reach the merits of Haney's contentions on appeal, we first must resolve the jurisdiction issue. Our inquiry in this regard is informed by an examination of Fed.R.App.P. 3 [1] and 4,[2] and authorities construing these rules.

 A notice of appeal is timely filed if filed with the district court within thirty (30) days following the date of entry of judgment. Fed.R.App.P. 4(a)(1). The law is clear that the timeliness of an appeal is "mandatory and jurisdictional." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 61, 103 S.Ct. 400, 403, 74 L.Ed.2d 225 (1982) (quoting *Browder v. Director, Department of Corrections*, 434 U.S. 257, 264, 98 S.Ct. 556, 560 (1978)); *Campbell v. Wainwright*, 726 F.2d 702, 703 (11th Cir. 1984); *Glass v. Seaboard Coast Line Railroad Co.*, 714 F.2d 1107, 1109 (11th Cir. 1983); Fed.R.App.P. 3 advisory committee note.[3] While it is equally clear that actual receipt of the notice of appeal by the district court within the Rule 4 period, even though not formally filed within that period, suffices to confer appellate jurisdiction, *see Hatchell v. Heckler*, 708 F.2d 578, 579 (11th Cir.1983) (citing *Parissi v. Telechron*, 349 U.S. 46, 75 S.Ct. 577, 99 L.Ed. 867 (1955) (construing 28 U.S.C. § 2107)); *Aldabe v. Aldabe*, 616 F.2d 1089, 1091 (9th Cir.1980), simply depositing the notice in the mail is not the same as filing it. *Sanchez v. Board of Regents*, 625 F.2d 521, 522 (5th Cir.1980), *appeal dismissed*, 633 F.2d 1210 (5th Cir.1981).[4]

 Applying these principles to this case, there is little doubt that Haney's actual notice of appeal was untimely filed, regardless of when it was mailed, since it apparently was received by the district court beyond the Rule 4 time limit. We nonetheless are constrained to hold that appellate jurisdiction is present in this case. Haney did file with the district court within thirty days after the judgment entry a motion for declaration of pauper status and an affidavit in support of his motion to proceed on appeal in forma pauperis. This court and its predecessor have held that the timely filing of papers such as these which clearly evince the intent to appeal substantially complies with the notice of appeal requirements, and therefore is the equivalent of filing a proper notice of appeal. *See Hatchell v. Heckler*, 708 F.2d at 580; *McDaniel v. Harris*, 639 F.2d 1386, 1388 n. 1 (5th Cir.1981). *See generally*, 9 J. Moore, B. Ward & J. Lucas, Moore's Federal Practice ¶ 203.09 (2d ed. 1983) (general discussion of liberal judicial construc-

---

**1.** Rule 3, which sets forth the mechanics of taking an appeal, provides in part:

**Content of Notice of Appeal.** The notice of appeal shall specify the party or parties taking the appeal; shall designate the judgment appealed from; and shall name the court to which the appeal is taken. Form 1 in the Appendix of Forms is a suggested form of a notice of appeal. An appeal shall not be dismissed for informality of form or title of the notice of appeal.

Fed.R.App.P. 3(c).

**2.** Rule 4 governs the timeliness of an appeal. It provides in part:

**Appeals in Civil Cases**

(1) In a civil case in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal required by Rule 3 shall be filed with the clerk of the district court within 30 days after the date of entry of judgment or order appealed from[.]

Fed.R.App.P. 4(a)(1).

**3.** We do not mean to imply that failure to comply with Rule 4(a) affects the subject matter jurisdiction of an appellate court. Rather, a timely notice of appeal is better understood as a "mandatory prerequisite to the exercise of appellate jurisdiction." *United States v. Ward*, 696 F.2d 1315, 1317 (11th Cir.), *cert. denied*, 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983); *Curacao Drydock Co. v. M/V Akritas*, 710 F.2d 204 (5th Cir.1983).

**4.** The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), adopted as precedent decisions of the former Fifth Circuit handed down prior to October 1, 1981. We also are bound by decisions of Unit B of the former Fifth Circuit rendered after that date. *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir.1982).

tion of Rule 3(a)).[5] We now proceed to address the substantive issues on appeal.

## RULE 704

■ Haney first contends that the district court erred when it excluded testimony of Dr. Ronald W. Dennie, one of his expert witnesses. Relying on Fed.R.Evid. 704, Haney urges that reversible error occurred when the district court struck from the videotape deposition of the doctor the following question and answer:

> *Question [by Haney's counsel]:* Now, getting back to this matter of the diagnosis, can you state, in your opinion, whether or not the doctor who made the diagnosis that you've read in this case, can you state, in your opinion, whether or not he was negligent or not, based on what you have read?
>
> *Answer [by Dr. Dennie]:* Yes, I would feel he was negligent, yes.

Deposition of Ronald W. Dennie, M.D., at 37–38. Dr. Meigs, however, argues that this testimony was properly excluded since the doctor's answer was more in the nature of a conclusion of law, than an opinion on a factual matter.[6]

■ Rule 704 provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Its adoption abolished the so-called "ultimate issue rule" which proscribed opinion testimony that ostensibly invaded the province of the jury. See Fed.R.Evid. 704 advisory committee note; 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 704[01]–[02] (1982); 11 J. Moore & H. Bendix, Moore's Federal Practice §§ 704.01[3]–.10 (2d ed. 1982). Despite the apparent clarity of Rule 704, courts interpreting it often struggle in attempting to characterize challenged testimony as either admissible factual opinions or inadmissible legal conclusions. *See* 3 J. Weinstein & M. Berger, *supra,* at 704–11 to –13. The distinction, as is readily apparent, is not always easy to perceive. *See Owen v. Kerr-McGee Corp.,* 698 F.2d 236, 240 (5th Cir.1983); 3 J. Weinstein & M. Berger, *supra,* at 704–5. We need not make that distinction in this case, however, since regardless of the proper characterization of an expert opinion such as the one

---

5. The following passage from Professor Moore, however, is instructive and merits lengthy quotation:

 It should be emphasized that in the main these cases [liberally construing Rule 3(a) and its predecessor, Civil Rule 73(a) ] have been criminal cases in which the appellant has been ignorant of the rules and appearing pro se. Thus, while they demonstrate the power of the courts of appeals to overlook irregularities in the filing of the notice of appeal, they are not to be read as indicating that Rule 3(a) is to be read as a rough guide line. *It is simple and explicit, and easily complied with, and an appellant who would avoid future complications should follow it to the letter.*

 9 J. Moore & H. Bendix, *supra,* at 3–41 (emphasis added and footnotes omitted). We wholeheartedly agree.

 The prudent attorney intending to prosecute an appeal should promptly file the Rule 3(c) notice of appeal, "perhaps the simplest instrument known to federal procedure," *id.* at 3–37, and thereafter insure that it has been timely filed. If there is any doubt in this regard, the attorney should move in the district court, pursuant to Fed.R.App.P. 4(a)(5), for an extension of time within which to file the proper notice. This is not asking too much of one admitted to

practice law. True, the cases hold filing papers evincing an intent to appeal within the Rule 4(a) period is the equivalent of filing a notice of appeal, and Rule 3(c), as amended in 1979, provides that informality of form or title of the notice should not result in dismissal. The fact remains, however, that considerable time, expense, and energy, judicial and otherwise, would be conserved if counsel would follow the simple and unambiguous language of Rules 3 and 4.

6. It is problematical whether or not Haney has effectively preserved the Rule 704 issue for review. Although Dr. Dennie testified by videotape deposition, the court reporter did not record that testimony. Unfortunately, the only videotape in the record is that of Drs. Holmes and Brinkley, two other experts called by Haney. While the record does contain a transcript of Dr. Dennie's testimony, it is not an edited version so it is impossible for us to determine precisely what testimony the jury in fact did hear. Since the appellees have not voiced this concern, and all parties agree in substance as to what testimony was stricken by the district court, we will address the Rule 704 question as best we can given the incomplete record we have before us.

now at issue, it is clear beyond cavil that no reversible error can be predicated on the exclusion of Dr. Dennie's opinion.[7]

The record reflects that the district court was mindful of the advisory committee notes to Rule 704 when it ruled adversely to Haney.[8] Record, Vol. 5 at 6 and Vol. 10 at 1422. This note underscores the fact that the rule does not exist in a vacuum; rather, to be admissible under Rule 704 an expert's opinion on an ultimate issue must be helpful to the jury and also must be based on adequately explored legal criteria. Fed.R.Evid. 704 advisory committee note. Although the record does not clearly reveal the district court's reasons for ruling as it did, the court may have concluded that since the witness would tes-

tify as to the relevant standard of care and offer his opinion on whether Dr. Meigs' conduct had fallen below that standard, the excluded opinion would be only marginally helpful to the jury, if helpful at all, or simply cumulative. It is difficult to find fault with either of these conclusions. Moreover, the district court, which apparently was not provided with any foundation evidence tending to show that Dr. Dennie was familiar with the elements of an Alabama negligence or malpractice action, could have reasonably found that the application of legal criteria instinct in the opinion elicited by Haney's counsel was inadequately explored.

In any event, even if the district court technically erred in excluding Dr. Dennie's

7. Our research indicates that the law in this circuit pertaining to the admissibility of an expert's opinion couched in legal terms is not crystal clear. We have found one decision antedating the adoption of the Federal Rules of Evidence which appears directly on point. The former Fifth Circuit, in *Steinberg v. Indem. Ins. Co.,* 364 F.2d 266, 273–274 (5th Cir.1966), held in a medical malpractice action that an expert witness could testify that in his opinion malpractice had occurred. The court expressly rejected the argument that this opinion was objectionable as going to the ultimate legal issue in the case, reasoning that malpractice actions required expert testimony and this type of opinion aided the trier of fact. *Id.* at 274.

We also have discovered a pre-Federal Rules of Evidence decision which reasonably can be seen as undercutting the force of the *Steinberg* holding. In *Bender v. Dingwerth,* 425 F.2d 378, 384 (5th Cir.1970), the court stated that allowing plaintiff's doctors to testify that in their opinion the defendant committed acts amounting to malpractice "invade[d] the factfinding function of the jury." The court then noted with approval law of the forum state which would exclude this opinion on the basis that what constitutes negligence or malpractice is a mixed question of law and fact. *Id.* To be sure, the view expressed by the *Bender* court is dictum, and is in part based on state law. The *Bender* decision nevertheless is difficult to ignore or dismiss out of hand.

More recent decisions underscore the lamentable fact that the adoption of Rule 704 did not totally dispel the confusion over the admissibility of expert opinions arguably amounting to conclusions of law. *See, e.g., Owen v. Kerr-McGee Corp.,* 698 F.2d at 240 (court read former Fifth Circuit cases as proscribing expert opinion amounting to legal conclusion, and noted after discussing Rule 704 that not only did such testi-

mony invade the province of the court, it was irrelevant as well); *United States v. Fogg,* 652 F.2d 551, 556–557 (5th Cir. Unit B 1981), *cert. denied,* 456 U.S. 905, 102 S.Ct. 1751, 72 L.Ed.2d 162 (1982) (court, in tax evasion case, held that accountant's opinion that certain funds would be considered constructive dividends admissible since not phrased as judicial instructions to jury and witness should have adequate knowledge of tax laws to allow introduction of his opinion); *United States v. Milton,* 555 F.2d 1198, 1203 (5th Cir.1977) (court, in illegal gambling prosecution, held admissible expert testimony that certain wagers were "lay off" bets, yet took pains to note that although Rule 704 abolished the per se rule against testimony on ultimate issue of *fact,* court still "must remain vigilant against the admission of legal conclusions.")

8. These notes provide in pertinent part:

The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. Thus the question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

Fed.R.Evid. 704 advisory committee note (citation omitted).

opinion, the result here would be the same. We will not reverse the district court on the basis of an erroneous evidentiary ruling unless Haney demonstrates that a substantial right of his has been affected. Fed.R. Evid. 103. *See Perry v. State Farm Fire & Casualty Co.*, 734 F.2d 1441, 1446 (11th Cir.1984). Certainly any possible error concerning the exclusion of this opinion was harmless. The parties agree that the jury heard Dr. Dennie state his opinion that Dr. Meigs' diagnosis and treatment of Haney fell below the applicable standard of care. Despite Haney's protestations to the contrary, this testimony surely was more meaningful, and probably more damaging to the position of Dr. Meigs, than the opinion Haney wanted the jury to hear.[9] Since "the inferences to be drawn from [Dr. Dennie's] testimony were manifest, if the jurors chose to draw them," *Arcement v. Southern Pacific Transportation Co.*, 517 F.2d 729, 732 (5th Cir.1975), this court will not disturb the judgment appealed from simply because the jury was not allowed to hear him say the treating physician was "negligent."

## HANEY'S USE OF ALCOHOL AND DRUGS

■ Haney also argues that the district court erred in admitting evidence of Haney's use of alcohol and drugs. He basically asserts, albeit inartfully, that: (1) evidence of his alcohol and drug use was irrelevant; (2) even if relevant, the probative value of this evidence was substantially outweighed by the danger of unfair prejudice; and (3) in any event, defendants improperly were allowed to introduce into evidence privileged communications. We address these assertions seriatim.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. With this broad definition of relevance in mind, we conclude that evidence of Haney's alcohol and drug use was highly relevant to many issues in this case, several of which were raised by Haney himself.

Initially, there is no doubt that Haney's level of intoxication when treated was relevant to his ability to communicate with medical personnel and their ability to restrain and obtain cooperation from him. Additionally, an examination of Haney's complaint reveals the relevance of his history of alcohol and drug use. Haney prayed therein for damages to cover future mental anguish, rehabilitation care, and loss of earnings. As the deposition testimony of Dr. Lawrence J. Gilgun, the clinical psychologist who treated Haney after the accident, reveals, Haney's ability to face his alcohol and drug problem would play a crucial role in his ability to adjust emotionally to his infirmity and become more fully rehabilitated. Dr. Gilgun also opined that Haney's vocational outlook would be much brighter if he did not indulge in alcohol and drugs. Moreover, the district court found that the challenged testimony was admissible, and, perforce, relevant, to rebut testimony offered by Haney pertaining to his lifestyle and quality of life before the accident. Record, Vol. 5 at 166 and Vol. 6 at 228–229. We will not disturb that finding.

■ Haney alternatively claims, relying on Fed.R.Evid. 403, that the district court should have excluded this evidence since

---

9. We do not stand alone in holding this view. Dean Ladd, discussing the two questions concerning testamentary capacity posed by the drafters of Rule 704, *see id.*, reasoned:

> [I]t would be much better that counsel ask the expert witnesses whether testator had the mental capacity to appreciate the nature and extent of his holdings and the natural objects of his bounty. These, of course, would be ultimate facts making up the group of facts from which the ultimate conclusion would be drawn. Because jurors realize that they are

the final triers to determine the issues and are reluctant to part with that right, there isn't much danger in reality from the use of all-embracing questions. From the standpoint of the objecting party these may do him much less harm than more skillfully asked questions which develop the opinion step by step leading the jury to accept the desired conclusion.

Ladd, *Expert Testimony*, 5 Van.L.Rev. 414, 424–425 (1952) (quoted in 3 J. Weinstein & M. Berger, *supra*, at 704–8).

whatever probative value it might have had was substantially outweighed by its danger of unfair prejudice. The district court, however, expressly found to the contrary. Record, Vol. 6 at 229. A trial court has broad discretion in balancing the probative value of evidence against its potential prejudicial effect, and we will not upset the balance struck unless there has been a clear abuse of discretion. *Noel Shows, Inc. v. United States*, 721 F.2d 327 (11th Cir. 1983). We find no such abuse in this case.

■ Haney also would have us reverse in this case because the district court allowed into evidence Dr. Gilgun's deposition. As already noted, this deposition contained certain references to Haney's alcohol and drug problem. Haney contends its admission was barred by Florida privilege law.

The parties agree that Florida law provides the rule of decision on the privilege issue. See Fed.R.Evid. 501. Florida, by statute, recognizes a psychotherapist-patient privilege. *See* Fla.Stat. § 90.503 (1983). Haney, however, apparently ignores that part of the statute which provides that no privilege exists "[f]or communications relevant to an issue of the mental or emotional condition of the patient in any proceeding in which he relies upon the condition as an element of his claim or defense." *Id.* § 90.503(4)(c). As we have seen, Haney explicitly prayed for damages to compensate him for mental anguish, rehabilitation care, and loss of future earnings. Obviously, his discussion with Dr. Gilgun about his alcohol and drug use was

not only relevant to these claims, but was inextricably bound to them. Hence, Haney may not invoke the privilege he effectively waived by bringing this action.[10] *Cf. Argonaut Insurance Co. v. Peralta*, 358 So.2d 232, 233 (Fla.Ct.App.) ("Surely when one brings a malpractice suit ... one's medical history becomes the subject matter of the suit and he would waive any claim to privilege he might have under the law, if any"), *cert. denied*, 364 So.2d 889 (Fla.1978).

## OPENING STATEMENTS

Haney also assigns as reversible error allegedly prejudicial and inflammatory remarks made by opposing counsel during opening statements. We do not agree.

■ Counsel for Dr. Meigs said in his opening statement that at the time of the accident, Haney was "stoned out of his mind." Record, Vol. 5 at 40. According to Haney, in common parlance "stoned" connotes a "stuper induced by drugs." Appellant's Opening Brief at 17. Since there was no evidence that Haney was under the influence of drugs, save alcohol, at the time of the accident, Haney categorically asserts that the younger members of the jury were improperly and incurably prejudiced against his client.

While we agree some persons in some circumstances might ascribe to the word "stoned" the meaning advanced by Haney, its use in this case cannot be viewed in isolation. When read in context, it is clear that counsel for Dr. Meigs was referring to excessive consumption of alcohol.[11] To

---

10. Our disposition of this issue makes it unnecessary to address appellees' contention that Haney also waived the protection of § 90.503 by noticing and taking the deposition now in issue, though we note this contention has much to commend it.

Haney also argues that admission of the deposition, violated a stipulation by the parties which provided that they could object to any question, except as to form, at the time of trial or at the time the deposition was offered into evidence. Quite apart from the fact that we find it hard to believe that this stipulation contemplated a party objecting to a question he himself asked of the witness, the record shows that Haney did register an objection to the admission of the deposition which was overruled

by the district court after considerable debate. Record, Vol. 12 at 1917–62.

11. A review of the opening statements made by counsel for Haney and Dr. Meigs is instructive in this regard. Counsel for Haney first adverted to the possible issue of Haney's intoxication. Record, Vol. 5 at 25. Haney's counsel then stated there would be "more than adequate testimony to the fact that [Haney] was not intoxicated." *Id.* In the initial portion of his opening statement, counsel for Dr. Meigs understandably alluded to his client's defense that, because of Haney's intoxication, Haney was unable to communicate effectively upon arrival at the hospital. *Id.* at 39–40. Shortly thereafter he stated, "But I will tell you from the beginning that this thing of somebody having a nice social drink or

contend that some members of the jury ineluctably assumed otherwise stretches credulity. Moreover, although the prompt objection to this statement by Haney's counsel was overruled, the district court did shortly thereafter instruct the jury to judge the case on the actual evidence, not on what the lawyers said the evidence was. Record, Vol. 5 at 41. After carefully reviewing the record, we are unable to say that use of the word "stoned" was improper, let alone inflammatory and prejudicial. Even if perhaps impolitic, it certainly "was not significantly outside the bounds of permissible advocacy," *Mercer v. Theriot*, 377 U.S. 152, 155, 84 S.Ct. 1157, 1159, 12 L.Ed.2d 206 (1964), and reversal therefore is inappropriate. *Cf. Zeigler v. Seaboard Coast Line Railroad Co.*, 437 F.2d 80, 81–82 (5th Cir.1971) (not error for trial judge to rule that term used in opening statement not having legal definition "was a figure of speech, a little flight of oratory, that ... counsel could well handle during course of trial without court intervention.").

■ Haney's contention with respect to the opening statement made on behalf of the hospital is similarly devoid of merit. Haney claims that references therein to his use of drugs and alcohol, in particular a reference to the opinion of Dr. Gilgun that Haney's prognosis would be good if Haney would refrain from their use, Record, Vol. 5 at 37–38, injected into the trial irrelevant, privileged, and inflammatory and prejudicial matter. Our prior discussion of the admissibility of Dr. Gilgun's deposition testimony disposes of Haney's arguments concerning relevance and privilege. Furthermore, since Haney's problem with alcohol and drugs was a proper subject of inquiry, no error can be based upon reference to it in an opening statement.

## THE DISTRICT COURT'S CONTROL OF THE TRIAL

■ Haney next contends that the district court erred when it instructed one of his expert witnesses who was being cross-

examined to simply answer questions without digression. A trial court has the authority and responsibility to control the examination of witnesses and the presentation of evidence in order to achieve the objectives of ascertaining truth and avoiding needless consumption of time. *See* Fed.R.Evid. 611(a). The discharge of this responsibility necessarily entails the exercise of discretion. We have carefully reviewed each instance Haney cites as an example of the district court's "chastisement" of the witness and conclude that the court did not abuse its discretion in attempting to insure the orderly and expeditious presentation of evidence. *Cf. United States v. Phelps*, 733 F.2d 1464, 1471 (11th Cir.1984) ("The scope and extent of cross-examination is within the sound discretion of the trial judge."). If Haney's counsel was not satisfied with the answers elicited from his witness on cross-examination, he had ample reason and opportunity to remedy this situation on redirect examination.

Haney also objects to the district court's refusal to allow him to ask leading questions of a witness he called in his case-in-chief. He reasons that Nurse Williamson, the emergency room technician who first met Haney upon arrival at Mizell Memorial Hospital, was "a witness identified with an adverse party," Fed.R.Evid. 611(c), and the use of leading questions therefore was permissible. The hospital argues that since Haney failed to make a threshold showing of actual hostility, the district court acted properly. Although we agree with Haney's reading of Rule 611(c), we nonetheless refuse to reverse the district court on this basis alone.

■ Prior to the adoption of Rule 611(c), before a party could lead a witness on direct examination, it had to be shown that the witness was actually hostile or was an adverse party, officer, director, or managing agent of such adverse party. *Ellis v. City of Chicago*, 667 F.2d 606, 612 (7th Cir.1981). Rule 611(c), however, significantly enlarged the class of witnesses

something is not in this picture. *We have a man that was stoned out of his mind. Id.* at 40

(emphasis added).

presumed hostile, "and therefore subject to interrogation by leading questions without further showing of actual hostility." *Ellis*, 667 F.2d at 613 (citing Fed.R.Evid. 611 advisory committee note); *see also Perkins v. Volkswagen of America, Inc.*, 596 F.2d 681, 682 (5th Cir.1979) (error for trial court to rule that employee of defendant would be plaintiff's witness if plaintiff called him). Since Nurse Williamson, an employee of one of the defendants present when the alleged malpractice may have occurred, certainly was identified with a party adverse to Haney, the district court misread Rule 611(c) when it refused to allow Haney to lead him until actual hostility was established. See 3 J. Weinstein & M. Berger, *supra*, at 611–60 to –61.

This mistake does not, however, mandate reversal. Firstly, Haney fails to identify just what information he was unable to elicit from Nurse Williamson because of the district court's ruling. Secondly, the record indicates that this witness was extensively examined and repeatedly impeached by Haney. Under these circumstances, we discern no abuse of the district court's discretion. Moreover, the district court's decision "will not be reversed absent a clear showing of prejudice to [Haney]." *Ellis*, 667 F.2d at 613. We find no such prejudice in this case.

## SUFFICIENCY OF THE EVIDENCE

 Haney's final [12] argument on appeal is that the jury's verdict was "inconsistent with the evidence." Appellant's Opening Brief at 33. Construing this assignment of error as one challenging the sufficiency of the evidence, we conclude that the jury's verdict must be upheld.

 When reviewing the sufficiency of the evidence supporting a general jury verdict, we are not free to substitute our judgment for that of the jury. *Griffin v. Swim-Tech Corp.*, 722 F.2d 677, 679 n. 1 (11th Cir.1984). Rather, our inquiry is limited to determining "whether or not reasonable jurors could have concluded as this jury did based upon the evidence presented." *Id.* While making this determination, we are obliged to examine all the evidence and draw all reasonable inferences in favor of the party prevailing in the district court. *Quinn v. Southwest Wood Products, Inc.*, 597 F.2d 1018, 1019 (5th Cir.1979).

The trial of this case lasted nearly three weeks, and the jury heard the testimony of twenty-four live witnesses, viewed four videotape depositions, and heard excerpts from at least one other deposition. After carefully reviewing the record, it is obvious that reasonable jurors could have found in

**12.** Haney also has filed a motion for leave to amend his brief, which was carried for resolution with the case. He wishes to add as an additional assignment of error the district court's refusal, until the trial was nearly completed, to allow him to introduce evidence on a national standard of care as it related to defendant Mizell Memorial Hospital. The hospital opposes the motion, essentially arguing that it is too late in the day now to add an additional assignment of error.

Preliminarily, we note that at oral argument Haney's counsel all but admitted that the "local" versus "national" standard of care issue raised in the instant motion has been abandoned. We nonetheless have given the motion consideration, and have examined the authority he relies on as justification for now raising this issue. Haney refers us to *Lamont v. Brookwood Health Servs., Inc.*, 446 So.2d 1018 (Ala.1983) (plurality opinion), in support of his argument that the trial court erred in initially ruling that defendant Mizell Memorial Hospital was held to a local rather than national standard of care. The fragmented nature of *Lamont*, however,

leads us to conclude that it does not alter the law as it stood when this action was tried. True, the Alabama Supreme Court has interpreted Ala.Code § 6–5–484 (1975) to require *physicians* to conform to a national standard of care. See *May v. Moore*, 424 So.2d 596 (Ala.1982); *Drs. Lane, Bryant, Eubanks and Dulaney v. Otts*, 412 So.2d 254 (Ala.1982); *accord, Morrison v. Washington County, Alabama*, 700 F.2d 678 (11th Cir.) (construing Alabama law), *cert. denied*, —— U.S. ——, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). The fact remains, however, that in *Lamont* only three justices of the Alabama high court would do the same for hospitals, *Lamont*, 446 So.2d 1018 (Embry, J., joined by Faulkner and Beatty, JJ.), while four justices indicated they would not, *id.* at 1020 (Torbert, C.J., joined by Maddox, J., concurring in the result); *id.* at 1021 (Shores, J., joined by Adams, J., concurring in the result), and the remaining justice that heard the case was of the view that the issue need not even have been addressed. *Id.* at 1020–21 (Jones, J., concurring in the result). Since *Lamont* is not authority for sustaining the motion now before us, it accordingly is denied.

favor of the defendants for a number of reasons.

The defendants at trial offered considerable testimony that regardless of the medical care given Haney, he could have incurred irreversible spinal cord damage either during the wreck itself, while being assisted to the side of the road, or while being transported to the hospital. Reasonable jurors certainly could credit this testimony. The jury also could have reasonably concluded that Haney's own conduct was the cause of his disability. Reasonable jurors could have easily concluded that the conduct of defendants did not fall below the standard of care due Haney.

We need not further hypothesize on the reasoning the jury may have employed to reach its verdict. We offer these theories consistent with the jury's decision simply because a good deal of evidence supporting them is found in the record, a record which reveals that this case was peculiarly appropriate for resolution by a jury. The evidence in the bitterly contested trial was in considerable conflict. Expert witnesses testified on behalf of all parties in support of their respective positions. We are unable to hold that the jury's verdict was based on anything less than substantial evidence, and, therefore, we AFFIRM.