[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 3, 2010
JOHN LEY
CLERK

No. 09-14759
Non-Argument Calendar
_____

D. C. Docket No. 07-21093-CV-JLK

JOHN JAFFE,
BARBARA JAFFE,

Plaintiffs
Counter Defendants
Appellants,

versus

BANK OF AMERICA, N.A.,

Defendant
Counter Claimant
Appellee,

AGRICULTURAL BANK OF CHINA,

Defendant
Counter Defendant
Cross Defendant
Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 3, 2010)

Before EDMONDSON, CARNES and MARTIN, Circuit Judges.

PER CURIAM:

In 2004 John and Barbara Jaffe decided to buy a 125-foot yacht. After consulting with their attorney, the Jaffes entered into a $6 million construction contract with FoShan Polymarine Engineering Co., a Chinese boat yard. The contract required the Jaffes to advance the funds for a performance bond in order to insure that the yacht would be built and delivered according to the contract's specifications. The contract also required the Jaffes to post an irrevocable standby letter of credit, which provided collateral security for Defendant-Appellee Agricultural Bank of China (ABC) to make a loan to FoShan to finance the construction of the yacht.

The Jaffes applied to Defendant-Appellee Bank of America for it to issue the letter of credit and provided it with the operative form and language to be used. Bank of America issued the letter of credit, which provides that it will pay ABC, the beneficiary, up to $6,030,500 upon ABC's presentation of a statement certifying that: "The amount of the draft drawn hereunder represents and covers unpaid balance of indebtedness including interest and bank charges, if any, due to the beneficiary by FoShan Poly Marine Engineering Co. LTD.; per yacht building contract no s125-1."

2

As it turned out, FoShan never built the yacht. To make matters worse, the Jaffes learned from the FBI that the performance bond was fraudulent. The Jaffes sought to cancel the letter of credit but were told that FoShan's breach of the underlying contract had no effect on Bank of America's obligation to pay ABC in the event that ABC made a facially conforming draw on the letter of credit. After an emergency hearing, the district court entered a preliminary injunction preventing Bank of America from dispersing any funds pursuant to the letter of credit. It is undisputed that ABC later sent Bank of America a facially conforming draw on the letter of credit, which would have been honored by Bank of America but for the issuance of the preliminary injunction.

The Jaffes filed an amended complaint naming ABC and Bank of America as defendants.[1] The amended complaint alleges that ABC conspired with FoShan to defraud the Jaffes of the funds intended for the purchase of the yacht. The complaint also asserts claims against Bank of America for negligent misrepresentation, breach of fiduciary duty, and equitable estoppel, all of which are based on certain misstatements and omissions in connection with the letter of credit. Specifically, the Jaffes contend that when Mr. Jaffe went to Bank of

---

[1] The amended complaint also named FoShan as a defendant, but the district court dismissed FoShan from the lawsuit because the Jaffes failed to obtain service of process on it.

America to obtain the letter of credit, he was told by the vice president assigned to the transaction, Christopher Ross, that the language of the letter of credit meant that Bank of America would not pay until the Jaffes had received their yacht. In other words, Ross allegedly told Mr. Jaffe that the language of the letter of credit meant "No Boat, No Money."

After a bench trial in late 2009, the district court found in favor of ABC and Bank of America on all counts. The court noted that although the Jaffes are apparently victims of a fraud perpetrated by FoShan, which never built the yacht, and the company that issued the fraudulent performance bond, neither of those entities are defendants in this case. After considering the parties' briefs and examining the record, we affirm the district court in all respects.

## I.

The Jaffes contend that the district court's decision to hold a bench trial violated their Seventh Amendment right to a jury trial. See U.S. Const. amend VII; United States v. M.C.C. of Fla., Inc., 863 F.2d 802, 803 (11th Cir. 1989). On three separate occasions, however, the Jaffes signed contractual waivers of their right to a jury trial. In pledging collateral to secure their obligation to reimburse Bank of America in the event of a draw on the letter of credit, the Jaffes executed a "Consumer Security Agreement," a "Security Agreement (Deposit Accounts

4

Specific)," and a "Substitute Collateral Agreement." Each of those agreements contained an express waiver of their right to a jury trial.

The Jaffes argue that the waivers are inapplicable because this case is about the issuance of the letter of credit, while the waiver clauses only address disputes over the Jaffes' reimbursement of Bank of America. But that interpretation runs contrary to the plain language of the waiver clauses. For example, the second waiver, which is very similar to the third waiver, provides:

> **16. <u>WAIVER OF JURY TRIAL</u>. THE PARTIES TO THIS AGREEMENT WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH THEY MAY BE PARTIES, ARISING OUT OF, IN CONNECTION WITH OR IN ANY WAY PERTAINING TO, THIS AGREEMENT. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTION OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS AGREEMENT. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.**

That language is unequivocal and broad in scope. The Jaffes' claims certainly are "in connection with" and "pertain[ ] to" the agreement between the Jaffes and Bank of America on the financing of the letter of credit. We therefore conclude that the jury trial waivers apply to the claims asserted in this case.

The Jaffes argue that even if the jury trial waivers apply, Bank of America should be judicially estopped from asserting them. The district court decided that

5

judicial estoppel was not warranted, a conclusion we review only for abuse of discretion. Robinson v. Tyson Foods, Inc., 595 F.3d 1269, 1273 (11th Cir. 2010). We will "affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc). Three factors typically inform the decision whether to invoke judicial estoppel: (1) whether the present position is clearly inconsistent with the earlier position; (2) whether the party succeeded in persuading a court to accept the earlier position, so that judicial acceptance of the inconsistent position in a later proceeding would create the perception that either the first or second court was mislead; and (3) whether the party advancing the inconsistent position would derive an unfair advantage. New Hampshire v. Maine, 532 U.S. 742, 750–51 (2001); Robinson, 595 F.3d at 1273.

The Jaffes demanded a jury trial in their amended complaint. They argue that Bank of America agreed to their demand because, in its answer, Bank of America asked for a bench trial on the equitable claims but said nothing about the legal claims or the first jury waiver. As the district court pointed out, however, the Jaffes signed the second and third jury trial waivers after Bank of America had filed its answer. Thus, the Jaffes must show that Bank of America took some position later in the proceedings—after the jury trial waivers were executed—that

6

is clearly inconsistent with its current position. The Jaffes point to Bank of America's motion to sever the equitable claims from the legal claims, which stated that it "seeks a separate bench trial of Count I (Injunctive Relief) prior to the jury trial of all other legal claims." In response, Bank of America characterizes that language as inartful, but still not an express demand for a jury trial. Bank of America says, and we agree, that its motion merely argued that the equitable claims should be heard first because that might moot the remaining, legal claims. When read in context, Bank of America's motion to sever the equitable claims from the legal claims did not affirmatively demand a jury trial.

When considering a party's intent for the purpose of judicial estoppel, we require "intentional contradictions, not simple error or inadvertence." Am. Nat'l Bank of Jacksonville v. FDIC, 710 F.2d 1528, 1536 (11th Cir. 1983). Bank of America's inadvertent statement implying that a jury trial may be appropriate is not clearly inconsistent with its current position. See id.; see also New Hampshire, 532 U.S. at 750–51; Robinson, 595 F.3d at 1273. Moreover, the Jaffes have failed to establish the second element of the New Hampshire test. 532 U.S. at 750–51. Bank of America's motion to sever did not persuade the district court to hold a bench trial instead of a jury trial. In fact, the court denied the motion. The district

court therefore did not abuse its discretion in deciding not to invoke judicial estoppel.

Because the jury trial waivers apply to this case and Bank of America is not estopped from asserting them, the Jaffes' right to a jury trial was not violated.

## II.

The Jaffes contend that the district court abused its discretion by refusing to let them ask leading questions of a witness they called in their case-in-chief. They argue that Chris Ross, a former Bank of America employee who had worked with the Jaffes on the letter of credit, was "a witness identified with an adverse party," Fed. R. Evid. 611(c), and the use of leading questions therefore was permissible.[2] See Haney v. Mizell Memorial Hosp., 744 F.2d 1467, 1477–78 (11th Cir. 1984). Although Ross left Bank of America four years before the trial commenced, he was a Bank of America employee when the alleged misrepresentations may have occurred, and Bank of America's counsel represented him personally throughout the litigation. Thus, Ross was in fact a witness "identified with" Bank of America, a party adverse to the Jaffes. See id. at 1478 (concluding that "an employee of one

---

[2] Federal Rule of Evidence 611(c) provides: "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions."

of the defendants present when the alleged malpractice may have occurred . . . certainly was identified with a party adverse to [the plaintiff]").

Rule 611(c), however, does not give the calling party an absolute right to ask leading questions. See Fed. R. Evid. 611(a) & (c). Instead, "[t]he district court has the discretion to allow or disallow leading questions of a witness identified with an adverse party, and once the district court exercises [its] discretion in that regard, the movant must establish an abuse of discretion to obtain a reversal." United States v. Hall, 165 F.3d 1095, 1117 (7th Cir. 1999) (quotation and other marks omitted); see also Scenic Holding, LLC v. New Bd. of Trustees of Tabernacle Missionary Baptist Church, 506 F.3d 656, 664 (8th Cir. 2007) ("[R]ule 611(c) is permissive and must be read in context with the trial court's general authority and discretion to control the conduct of the trial.").

We discern no abuse of the district court's discretion. First, the district court explained that its decision was necessary to keep the trial moving along in an orderly fashion. See Rodriguez v. Banco Cent. Corp., 990 F.2d 7, 12 (1st Cir. 1993) ("Trial judges are constantly making judgments about the use of leading questions, the need to clarify witness answers, and similar matters of trial management. In this realm the widest possible latitude is given to the judge on the scene."). Second, the district court expressly found that Ross harbors no

9

animosity toward the Jaffes and that he testified in a forthright and direct manner.

Third, the record indicates that Ross was extensively examined, and the district court allowed the Jaffes to attempt to impeach Ross on several occasions with his prior deposition testimony. See Haney, 744 F.2d at 1478. Moreover, the district court's decision "will not be reversed absent a clear showing of prejudice" to the Jaffes, Haney, 744 F.2d at 1478 (quotation marks omitted), and we find no such prejudice in this case.[3]

## III.

The Jaffes contend that the district court misunderstood their legal claim against Bank of America and made clearly erroneous factfindings. We review the district court's factfindings only for clear error and its conclusions of law de novo. Renteria-Marin v. Ag-Mart Produce, Inc., 537 F.3d 1321, 1324 (11th Cir. 2008). In order to succeed on their claims against Bank of America, the Jaffes must establish that Ross represented to Mr. Jaffe that the language in the letter of credit meant "no boat, no money." Crediting Ross's testimony over Mr. Jaffe's version of events, the district court found that no such representation ever occurred.

---

[3] The Jaffes also contend that their Sixth Amendment rights were violated. We doubt that counsel would have made this argument had they re-read the first four words of the Sixth Amendment. See U.S. Const. amend VII ("In all criminal prosecutions, . . . ." (emphasis added)).

10

The Jaffes assert that the district court found only that Mr. Jaffe never asked Ross to add a specific "no boat, no money" stipulation into the letter of credit. That finding is irrelevant, the Jaffes argue, because their claims against Bank of America are based on Ross's assurances about what the original letter of credit meant—not whether he promised to include an additional stipulation. However, the district court found not only that Ross never promised to add a "no boat, no money" stipulation, but also that Ross never gave any assurances about the meaning of the letter of credit. For example, the district court noted that "Mr. Ross made it clear that he included in the letter of credit only what he and Mr. Jaffe had discussed, <u>and</u> that those discussions included <u>nothing to the effect of 'no boat, no money'</u>" (emphasis added).

The district court explicitly found that Ross's testimony was credible and that Mr. Jaffe's testimony was not. See <u>Daley v. United States</u>, 792 F.2d 1081 (11th Cir. 1986) ("[W]hen a trial court's finding is based on credibility determinations, that finding, if not internally inconsistent, can virtually never be clear error." (quotation marks omitted)). Based on that explicit finding and the judgment, we can infer that the district court credited Ross's testimony that he never told Mr. Jaffe that ABC could not draw on the letter of credit unless the yacht was delivered according to the construction contract. See <u>United States v.</u>

11

$242,484.00, 389 F.3d 1149, 1154 (11th Cir. 2004) (en banc) ("[W]e and other federal appellate courts have inferred from a district court's explicit factual findings and conclusion implied factual findings that are consistent with its judgment although unstated.").

The Jaffes argue that even if Bank of America did not affirmatively mislead them, the bank breached its fiduciary duty to the Jaffes by failing to correct their mistaken impression that ABC could not draw on the letter of credit until the yacht was delivered.[4] The district court found, however, that "[t]he relationship between Mr. Jaffe and Bank of America was nothing more than lender-borrower, which is nothing more than the product of an arms-length transaction, not a fiduciary relationship." See Motorcity of Jacksonville, Ltd. v. Se. Bank N.A., 83 F.3d 1317, 1339 (11th Cir. 1996 (en banc) ("Under Florida law, it is clear that a lender does not ordinarily owe fiduciary duties to its borrower."), vacated, 519 U.S. 1087, 117 S.Ct. 760 (1997), reinstated, 120 F.3d 1140, 1145 (11th Cir. 1997) (en banc). That finding is supported by Ross's testimony that he did not tell Mr. Jaffe that Bank of America would undertake to protect his interests; that he asked Mr. Jaffe to

---

[4] The Jaffes argue that the district court failed to consider deposition testimony that proves Bank of America was aware of Mr. Jaffe's mistaken interpretation of the letter of credit. We will assume, for the sake of argument, that the deposition does show that Bank of America knew about, and failed to correct, Mr. Jaffe's interpretation.

discuss legal issues with his own counsel several times throughout the transaction; and that Mr. Jaffe was directive in his dealings with the bank. The district court also noted that Mr. Jaffe was a sophisticated businessman who had been involved in more than $1 billion in lending transactions; that he asked his lawyer to review the letter of credit; and that he negotiated for a performance bond in order to protect himself in the transaction. Based on those facts, the district court concluded that Bank of America never agreed to assume a fiduciary duty on behalf of the Jaffes. See id. ("[O]ne may not unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary." (quotation and other marks omitted)).

The Jaffes argue that finding is clearly erroneous, but we disagree. The facts that Bank of America and Mr. Jaffe had engaged in many transactions over a 25 year period and that the bank provided him with a private client manager do not call the district court's finding into question. See id. at 1340 n.21 ("[I]t is clear that [the bank's] long standing business relationship with [the plaintiff], without more, cannot transform the lender-borrower relationship into a fiduciary one."). Contrary to the Jaffe's assertion, their receipt of a "favored client fee" from Bank of America actually suggests there was no fiduciary relationship. See Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc., 842 So. 2d 204, 208 (Fla. 3d DCA 2003)

13

(explaining that special circumstances may impose a fiduciary duty where the lender "receives any greater economic benefit than from a typical transaction"). It is true that Bank of America advised and counseled the Jaffes in various aspects of the deal, but it is not clear whether any of those actions went beyond the typical lender-borrower relationship that would exist in these circumstances. We cannot say that the district court clearly erred in finding that Bank of America had no fiduciary duty to the Jaffes.

Alternatively, we conclude that the Jaffes claim for fiduciary breach fails because the information that Bank of America allegedly neglected to disclose—that the letter of credit did not mean "no boat, no money"—was available to the Jaffes and not peculiarly within the bank's knowledge. See Barnett Bank of W. Fla. v. Hooper, 498 So.2d 923, 925 (Fla. 1986) ("[W]here a bank becomes involved in a transaction with a customer with whom it has established a relationship of trust and confidence, and it is a transaction from which the bank is likely to benefit at the customer's expense, the bank may be found to have assumed a duty to disclose facts material to the transaction, peculiarly within its knowledge, and not otherwise available to the customer."). The district court found that Mr. Jaffe was told by his attorney, Kurt Bosshardt, that the letter of credit was "[n]ot based on performance or terms or documents" of

14

the construction contract. Indeed, Bosshardt testified that he "must have alerted" Mr. Jaffe of that fact because an "alarm bell" went off when he read the relevant documents. Moreover, the yacht construction contract made clear that it was independent from the letter of credit. It said: "For the avoidance of doubt, the [Jaffes'] Letter of Credit shall remain in full force and effect notwithstanding termination of this Agreement, and the beneficiary may draw on it in accordance with its terms." Because Mr. Jaffe knew or should have known about the meaning of the letter of credit—facts that were not "peculiarly within [Bank of America's] knowledge"—the Jaffes' claim for fiduciary breach must fail. See id.; see also Bircoll v. Miami-Dade County, 480 F.3d 1072, 1088 n.21 (11th Cir. 2007) (we may affirm a decision of the district court on any ground supported by the record).

IV.

The Jaffes contend that the district court erred in rejecting their claim against ABC for engaging in letter of credit fraud. Our analysis of this issue begins with the well-established independence principle, which provides that the obligation to make payment to the beneficiary of a letter of credit is independent of any party's performance on the underlying contract. See, e.g., Banco General Runinahui, S.A. v. Citibank Int'l, 97 F.3d 480, 482 (11th Cir. 1996) ("The key to the commercial vitality of the letter of credit is its independence: it is wholly

15

separate and distinct from the underlying contract."); Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1579 (11th Cir. 1994) ("The issuer must honor the engagement to pay upon presentation of the proper documents regardless of the [parties'] performance on the underlying contract."); Pro-Fab, Inc. v. Vipa, Inc.,772 F.2d 847, 852–53 (11th Cir. 1985) ("The bank is obligated to look only to the requirements of the letter of credit, not to any other activity between the parties."). Under the independence principle, FoShan's breach of its contract with the Jaffes does not affect the validity of the letter of credit, to which ABC is the named beneficiary.

The Jaffes contend that the independence principle is inapplicable to this case for two reasons. First, they argue that the general principle of independence is trumped by the specific language of the letter of credit, which incorporates by reference the terms of their underlying contract with FoShan. That interpretation is based on the language in the letter of credit stating "per yacht building contract no. s125-1," which arguably means that ABC had to certify that FoShan had fulfilled its contract with the Jaffes in order to draw on the letter of credit. The Jaffes' argument fails as a matter of law. The letter of credit at issue in this case provides that it is governed by the Uniform Customs and Practices for Documentary Credits (UCP). And the UCP specifically provides that: "Credits, by

16

their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), <u>even if any reference whatsoever to such contract(s) is included in the Credit</u>." UCP Art. 3 (emphasis added); <u>see also</u> <u>Barclay's Bank v. Dresdner Bank Lateinamerika (In re Lancaster Steel Co.)</u>, 284 B.R. 152, 160 (Bankr. S.D. Fla. 2002) ("Mere general references to underlying agreements are surplusage and are not to be considered in deciding whether the beneficiary has complied with the terms of the credit. It is only the most insistently clear language that will permit a court to deviate from this rule." (citation omitted)). Thus, the district court properly found that ABC was under no obligation to assure that the Jaffes' yacht was built and delivered before it could draw on the letter of credit.[5]

The Jaffes' second argument that the independence principle does not apply is that the letter of credit agreement itself was procured through fraud because ABC never made a loan to FoShan. We have recognized that "a court may enjoin payment on a letter of credit, despite the independence principle, where there is shown to be fraud by the beneficiary of the letter of credit." <u>Harris Corp. v. Nat'l</u>

---

[5] The Jaffes urge us to look at extrinsic evidence regarding the parties' understanding of the letter of credit. We decline to do that because none of the extrinsic evidence would trump UCP Article 3, which governs our interpretation of the letter of credit. In any event, most of the extrinsic evidence the Jaffes point us to came into existence after the letter of credit was signed and does not persuade us that the Jaffes' interpretation of the letter of credit is correct.

17

Iranian Radio & Television, 691 F.2d 1344, 1355 (11th Cir. 1982). The fraud exception to the independence principle, as acknowledged by the Jaffes in the pretrial stipulation, must be construed narrowly and must be based on legitimate and supported allegations. See Resolution Trust Corp. v. United Trust Fund, 57 F.3d 1025, 1034 n.11 (11th Cir. 1995). The Jaffe's have failed to satisfy that burden. They offered no direct evidence of misconduct, and two ABC witnesses testified that the bank did make a loan to FoShan. The Jaffes argue that testimony was inadmissible hearsay, but the two witnesses testified about their own prior actions and they did so at the trial. See Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); see also City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 561 (11th Cir. 1998) (holding that trial testimony about "matters in which [the witness] personally participated or which he personally observed" is not hearsay).

The Jaffes also assert that any loan those two witnesses made could not have been secured by the Jaffes' letter of credit because the witnesses testified that their branch of ABC did not deal with letters of credit. The district court's finding to the contrary is not clearly erroneous. One reasonable inference from the trial testimony is that more than one branch of ABC was involved with the transaction.

18

V.

The Jaffes also contend that their exposure should be limited to $350,000, which was the amount of the letter of credit before it was increased to $6,030,500. They argue that the amendment to the original letter of credit is invalid because some of the other parts of their proposed amendment were rejected and, under the UCP, "partial" amendments are not allowed. See UCP 500, Art. 9(d)(iv) ("If there is more than one amendment covered in the same amendment advice, the Beneficiary must accept or reject all amendments in that particular advice."). The Jaffes, however, failed to preserve this issue for trial. They expressly agreed in the joint pretrial stipulation that "the letter of credit was amended to increase the amount to $6,030,500" and that they "authorized each and every amendment made to the letter of credit." The Jaffes are bound by that stipulation. See G.I.C. Corp., Inc. v. United States, 121 F.3d 1447, 1450 (11th Cir. 1997) (stating that, absent manifest injustice, "parties are bound by their stipulations and a pretrial stipulation frames the issues for trial"). Moreover, the Jaffes failed to list the "partial amendment" issue in the pretrial stipulation as a disputed issue of fact or law. See Pacific Indem. Co. v. Broward Cnty., 465 F.2d 99 (5th Cir. 1972) ("The failure to indicate in the pre-trial order that an issue remains to be resolved at trial usually precludes the offer of proof on the issue at trial . . . ."). We have repeatedly stated

19

that, "[a]s a general principle, this court will not address an argument that has not been raised in the district court." Stewart v. Dep't of Health & Human Servs., 26 F.3d 115, 115 (11th Cir. 1994); see also, e.g., United States v. Brown, 587 F.3d 1082, 1088 (11th Cir. 2009). Because none of the exceptions to that general principle apply to this case, see Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1332–35 (11th Cir. 2004), we decline the Jaffes' invitation to address the "partial amendments" issue.

**AFFIRMED.**